**UNITED STATES of America, Plaintiff,**

v.

**ALL FUNDS PRESENTLY ON DEPOSIT OR ATTEMPTED TO BE DEPOSITED IN ANY ACCOUNTS MAINTAINED AT AMERICAN EXPRESS BANK, American Express Bank, Ltd., Citibank International, Citibank, N.A., Delta National Bank, and Capitol Bank in the Names of Cambitur, S.A., Casa de Cambios, Cambidex, Multicambio, S.A., Michel Duchamp, JCJ, Inc., and all Related Entities and Individuals (Collectively Referred to as the Claimants), Including,**

but not Limited to, American Express Bank Account No. 00800045, American Express Bank, Ltd. Account No. 000708008, Citibank N.A. Account No. 36964602, Citibank, N.A. Account No. 36994895, Delta National Bank Account No. 602187, and Capitol Bank Account No. 140023033, and all Property Traceable Thereto, Defendants.

No. CV–92–5310.

United States District Court,
E.D. New York.

Aug. 31, 1993.

See also, 813 F.Supp. 180.

Arthur P. Hui, Jorin Rubin, Asst. U.S. Attys., for plaintiff.

Alan S. Ross, Robbins, Tunkey, Ross, Amsel & Raben, Miami, FL, for defendant Casa de Cambios, Cambidex.

Mario Malerba, Malerba, Carbone & LaSale, Kew Gardens, NY, for defendant Cambitur.

*MEMORANDUM AND ORDER*

GLASSER, District Judge:

On November 12, 1992, the United States commenced this action to seize and forfeit monies on deposit at various designated bank accounts and all property traceable thereto, pursuant to 18 U.S.C. §§ 981, 984, 1956 and 1957 and 21 U.S.C. § 841 *et seq.* and 881(a)(6). On the same day that the government filed its verified complaint *in rem*, the Clerk of this Court issued a warrant of arrest, pursuant to Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims (the "Supplemental Rules"), for the seizure of the defendant funds and all property traceable thereto. Subsequent amendments to the complaint allege violations of 31 U.S.C. §§ 5313 and 5324.

Among the accounts that the government seized were the following:

> American Express Bank accounts numbered **00800045** and **000708008**, containing a total of approximately $1,562,994.42, both of which were held by the Bank in the name of **Cambitur, S.A.** ("Cambitur");

> Citibank, N.A. account numbered **36964602** containing approximately $1,200,000, held in the name of **Casa de Cambios, Cambidex** ("Cambidex").[1]

The United States alleges that the funds contained in these accounts are proceeds traceable to the sale of narcotics, have been used to facilitate the laundering of narcotics proceeds, and were obtained in violation of various reporting requirements. Claimants Cambitur and Cambidex now move this court for a grant of summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] For the reasons described be-

1. The government also seized Citibank, N.A. account numbered **36994895** containing approximately $412,742.42, held in the name of **Multicambio, S.A.** ("Multicambio"). Affidavits submitted by the government in response to Multicambio's motion incorrectly refer to this account by # 36964502. (Affidavit of Special Agent Juan Arrivillaga, dated June 17, 1993, at ¶ 18; Affidavit of Postal Inspector James Callery, dated June 17, 1993, at ¶ 9). After filing this motion, Multicambio entered into a Stipulation of Settlement with the government thereby rendering that claimant's summary judgment motion moot.

Finally, the government seized Delta National Bank account numbered 600616, held in the name of Michel Duchamp, and Capital Bank account numbered 140023033, held in the name of JCJ, Inc. Neither Duchamp nor JCJ has filed a notice of claim in this action.

2. In connection with its motion for summary judgment, Cambidex filed affidavits of Cecilia, Eugenio, and Marco Cardenas, all of whom are shareholders, officers, and/or employees of Casa de Cambios, Cambidex; a 3(g) Statement; Memoranda of Law; and various exhibits, including

low, claimants' motions are granted in part and denied in part.

## FACTS

### I. *The Herrera Narcotics Connection*

The original impetus for the government's seizure of the funds in this action appears to be evidence uncovered during a criminal investigation of Helmer Herrera and specifically through a search of the residence of an individual named Jesus Linier Morales Maya, a.k.a. Remendon ("Remendon"), a known narcotics trafficker. Helmer Herrera controls an organization (the "Herrera Organization") which, as part of the cocaine cartel headquartered in Cali, Columbia, engages in narcotics trafficking and money laundering activities. (Declarations of Special Agent Juan Arrivillaga at ¶ 1). The Herrera Organization has been involved in distributing cocaine and laundering the proceeds of its narcotics trade in the New York City area. (Arrivillaga Decls. at ¶ 2).

The government contends that several confidential sources of information, previously proven to be reliable, have described the money laundering methods used by the Herrera Organization. (Arrivillaga Decls. at ¶ 3). Specifically, the Organization uses individuals called "smurfs" to purchase money orders in a manner calculated to avoid the threshold reporting requirement of $10,000 and/or the threshold identification requirement of $3,000. The smurfs are told to purchase large volumes of small, even denominations of money orders which are then smuggled out of the United States to foreign countries, one of which is Ecuador. (Arrivillaga Decls. at ¶¶ 3–4). In Ecuador, individuals working for the Herrera Organization present the money orders to banks or money exchange houses to be cashed; the proceeds are allegedly given to representatives of the Herrera Organization in Ecuador or Columbia. (Arrivillaga Decls. at ¶ 4). The money exchange houses profit from the purchase of money orders through a favorable exchange rate for Ecuadoran currency, and they maintain American bank accounts as repositories for the dollars that they use in exchange for Ecuadoran sucres.

On or about March 26, 1991, law enforcement officers executed a search of the premises located at 1135–18 94th Street, Queens, New York, where Remendon then resided (the "Remendon premises"). (Arrivillaga Decls. at ¶ 5). During this search, the government recovered approximately two million dollars ($2,000,000) in United States currency and approximately six million dollars ($6,000,000) in the form of carbon copy receipts of blank money orders (the "Remendon money orders"). (Arrivillaga Decls. at ¶ 6). The Remendon money orders were in small, even denominations, and therefore appeared to the government to have been purchased in a manner calculated to avoid the $3,000 reporting requirement of 31 U.S.C. § 5325 and the $10,000 reporting requirement of 31 U.S.C. § 5313. (Arrivillaga Decl., dated May 7, 1993, at ¶ 10). Remendon subsequently pled guilty before Judge Raggi to violations of 31 U.S.C. § 5316(b) in connection with the Herrera Organization's money laundering activities; he is currently incarcerated and serving his eight-year sentence. (Arrivillaga Decls. at ¶ 7).

At Remendon's premises, law enforcement officers also discovered documents and written records containing several specific names in connection with codes and substantial

---

its account statements and an enlarged photograph of the business located in Cuenca, Ecuador. Cambitur's motion papers included an affidavit of Rosa Real, a shareholder of Cambitur, and an affidavit of Mario Malerba, attorney for Cambitur, which informs the court of Cambitur's intent to rely on Cambidex's motion papers; notably, Cambitur failed to file a 3(g) statement, and the statement handed up by counsel at oral argument did not comply with the requirements of that Local Rule. Consequently, this court denied Cambitur's motion for summary judgment from the bench; however, this opinion spells out the full rationale for that denial.

The government responded separately to each claimant's motion by filing Counter 3(g) Statements, briefs, various exhibits, and declarations of DEA Special Agent Juan Arrivillaga, Postal Inspector James Callery, and Assistant United States Attorneys Arthur Hui and Jorin Rubin. Much of the information contained therein or appended as exhibits is duplicative, although some factual distinctions do exist. Hereinafter, cites which refer to generic information contained in all the declarations will be denoted solely by paragraph reference; cites which refer to specific information about a particular claimant will identify the declaration by date.

sums of money. (Arrivillaga Decl., dated May 7, 1993, at ¶¶ 12–16). Subsequent investigations indicate that the written records relate to Remendon's receipt and distribution of narcotics proceeds in the form of cash and money orders on behalf of the Herrera Organization. (Arrivillaga Decl., dated May 7, 1993, at ¶¶ 12–16).[3] According to the government, the DEA has determined that a total of $5,139,183.00 in drug money was given to Remendon in March of 1991 and that from January to March 19, 1991 a total of 38 million dollars was received by Remendon. (Arrivillaga Decl., dated May 28, 1993, at ¶ 12). The government contends that the documents and money order receipts uncovered in the Remendon search corroborate the information received from its confidential sources describing the smurf money laundering operation.

As further corroboration of the money laundering scheme, the government points to the arrest of Sandra Lorena Gomez in late June of 1991 at John F. Kennedy International Airport in Queens, New York. At the time of Gomez's arrest for violations of 31 U.S.C. §§ 5313 *et seq.*, law enforcement officers discovered approximately $250,000 in the form of small, even denominations of money orders (the "Gomez money orders") hidden in the false bottom of Gomez's suitcase. (Arrivillaga Decl., dated May 7, 1993, at ¶ 17; Arrivillaga Decl., dated June 17, 1993, at ¶ 14). Gomez was attempting to transport the suitcase from the United States to Ecuador. (Arrivillaga Decl., dated May 7, 1993, at ¶ 17; Arrivillaga Decl., dated June 17, 1993, at ¶ 15). The Gomez money orders bore similarities to the Remendon money orders: both sets were blank; both sets were in even hundred dollar denominations; and both had been purchased at substantially the same facilities. (Arrivillaga Decl., dated May 7, 1993, at ¶ 19; Arrivillaga Decl., dated June 17, 1993, at ¶ 16). According to Special Agent Arrivillaga, the government subsequently learned that Gomez was working for

the Herrera Organization and was assisting in their money laundering activities by carrying money orders to Ecuador. (Arrivillaga Decl., dated May 7, 1993, at ¶ 18). Her arrest also confirms prior information that the Herrera organization used small appliances and luggage to smuggle money orders and cash outside the United States. (Arrivillaga Decl., dated May 7, 1993, at ¶ 16; Arrivillaga Decl., dated June 17, 1993, at ¶ 13).

## II. *Tracing the Money Orders to the Defendant Accounts*

After recovering the carbon copy receipts of the Remendon money orders in 1991, law enforcement officers discovered that approximately $1,250,000 of these money orders had been deposited into the Cambidex account at Citibank, a fact that Cambidex does not dispute. (Arrivillaga Decl., dated May 7, 1993, at ¶ 8; Cambidex 3(g) Statement at ¶ 2). Similarly, approximately $639,000 of the Remendon money orders had been deposited in the Cambitur account at American Express Bank in New York City. (Arrivillaga Decl., dated May 28, 1993, at ¶ 18).

All of the Remendon money orders were purchased at various post offices, banks, and other institutions licensed to sell money orders in the metropolitan New York area. (Arrivillaga Decls., dated May 7 & 28, 1993 at ¶¶ 9–10; Arrivillaga Decl., dated June 17, 1993 at ¶¶ 9, 24). In the majority of cases, the money orders were purchased in small, even denominations and in sequential series the aggregate value of which fell just below the $3,000 identification requirement and/or the $10,000 reporting requirement of Title 31. (Arrivillaga Decls. at ¶¶ 8–10; Callery Decl., dated May 7, 1993, at ¶¶ 9–11; Callery Decl., dated May 28, 1993, at ¶¶ 11–12; Callery Decl., dated June 17, 1993, at ¶¶ 10–11). None of the Remendon money orders which were deposited into the accounts of Cambitur or Cambidex listed any street address for the alleged remitters or purchasers; a few of those orders bore references to "N.Y." or "Calif." (Callery Decl., Dated May 28, 1993,

---

3. For example, papers found in the apartment indicated that Remendon employed approximately fifteen smurfs who purchased money orders in denominations between $500 and $700. Certain of the papers refer specifically to amounts of money in money orders. Other documents include envelopes which bear handwriting setting forth individual amounts of money and an aggregate total. (See, e.g., Arrivillaga Decl., dated May 28, 1993, at ¶¶ 12–14; Arrivillaga Decl., dated June 17, 1993, at ¶¶ 9–11).

at ¶ 12; Callery Decl., Dated May 7, 1993, at ¶ 11c; Callery Decl., dated June 17, 1993, at ¶ 11). Several of the Remendon money orders bore an unusual seal or symbol on their reverse side which the government claims constitutes a device to identify narcotics proceeds. (Callery Decl., Dated May 7, 1993, at ¶ 11c).

The government alleges that after March 26, 1991, the date on which the Remendon search took place, and as recently as October of 1992, money orders in United States currency which were the proceeds of narcotics transactions were deposited into the Cambitur accounts. (Arrivillaga Decl. dated May 28, 1993, at ¶¶ 22–23). As an example, the government explains that sometime between February of 1991 and November of 1992, Cambitur paid approximately $1,250,000 to account no. 602187 at Delta National Bank in the name of "Michel Duchamp"; investigation revealed that "Michel Duchamp" is a fictitious name and that the Delta account was controlled by two citizens of Columbia who are associated with a company named Proaves, S.A. The incorporation papers of Proaves identify Edgar Alberto Garcia Montilla as one of the company's corporate officials. In April of 1992, Garcia Montilla was convicted in a Luxembourg court of laundering narcotics proceeds on behalf of Jose Santa Cruz Londono and others in the Cali Cartel; he is now incarcerated in Luxembourg and fighting extradition attempts by the United States to try him in this district for narcotics trafficking and money laundering violations. (Arrivillaga Decl. dated May 28, 1993, at ¶ 23). Furthermore, discussions with law enforcement officers in conjunction with certain checks drawn on the Cambitur account between February of 1991 and November of 1992 indicate that payees of the checks are targets of ongoing money laundering and narcotics trafficking violations.

The government also alleges that following March of 1991, money orders purchased in a manner calculated to avoid the reporting and identification requirements of Title 31 continued to be deposited into the defendant accounts. More specifically, according to Postal Inspector Callery, a review of records maintained by the United States Postal Service during the period from December 1991 through September 1992 reveals that approximately $1,900,000 (in the form of postal money orders which had been purchased to avoid identification) were deposited into Cambitur's American Express account. (Callery Decl., dated May 28, 1993, at ¶¶ 13–14).[4] Similarly "suspicious" deposits—totalling approximately $51,000, allegedly were made into Cambidex's Citibank account on August 14, August 19, and November 13 of 1992. (Callery Decl., dated May 7, 1993, at ¶¶ 18–20).

### III. *Commencement of this Action*

As mentioned above, the United States commenced this action to seize and forfeit monies on deposit in the above-listed defendant accounts by filing a verified complaint *in rem* on November 12, 1992, over eighteen months after the search of the Remendon premises. In that complaint, the government alleged that the funds contained in the accounts constituted proceeds traceable to the sale of narcotics and had been used to facilitate the laundering of said proceeds. The complaint cited as statutory authority: 18 U.S.C. § 981 (civil forfeiture provision for proceeds involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and 31 U.S.C. §§ 5313 and 5324); 18 U.S.C. § 984 (civil forfeiture of fungible property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957 and 31 U.S.C. § 5322); and 21 U.S.C. § 881(a)(6) (civil forfeiture of property exchanged for or traceable to controlled substances). On the same day that the government filed its verified complaint, the Clerk of this Court issued a warrant of arrest, pursuant to Rule C(3) of the Supplemental Rules, for the seizure of the defendant funds and all property traceable thereto.

---

4. According to records produced by American Express Bank, it appears that Cambitur's New York American Express account receives all money order deposits. Cambitur then directs American Express Bank to transfer funds from its New York account to its Florida account. Thus, the defendant Cambitur account with American Express Bank in Florida appears to receive proceeds directly traceable to the money orders deposited into the defendant Cambitur account in New York.

On November 13, 1992, the United States filed an amended verified complaint *in rem*. That same day, the Clerk issued a supplemental warrant for arrest, which was executed on the above-mentioned banks by the United States Marshals service. The amended complaint sought the same funds in the subject accounts, but now included, as well, "all funds attempting to be deposited" in those accounts. The government claims that the amendment resulted from information that monies involved in violations of 18 U.S.C. §§ 1956 and 1957 were continuing to be deposited into the defendant accounts.[5]

In December of 1992, the United States filed a second amended verified complaint *in rem* against the defendant funds and accounts, alleging additional facts supporting a claim for relief under Sections 981 and 984, based upon failures to file currency reports and structuring violations prohibited by 31 U.S.C. §§ 5313 and 5324.

### IV. *Claimants*

As mentioned above, each claimant is an exchange house or "casa de Cambios" located in Ecuador, South America: Casa de Cambios, Cambidex was incorporated in 1987 and is located in Cuenca, Ecuador (Cardenas Affs. ¶ 2); Cambitur was incorporated in 1956 and is located in Guayaquil, Ecuador. (Real Aff. ¶ 4). Both cambios allege that they follow careful record keeping procedures and comply with the banking laws of Ecuador, by, for example, requiring a Cedula (an Ecuadoran identification card), telephone number, and address from anyone negotiat-

ing a money order. (Cardenas Affs. ¶ 2; Real Aff. ¶¶ 7–8). Based on the limited discovery to date, the United States disputes the cambios' representations concerning their record-keeping and the cambios' allegations that they have abided by all provisions of Ecuadoran law. (Counter 3(g) Statement ¶ 1).

In addition to representing that they have done everything within their power to avoid dealing with illegitimate funds, claimants assert that their accounts cannot be seized because any tainted funds that might have been deposited have already passed through those accounts. Cambidex attaches as Exhibit 5 to its moving papers what appear to be bi-weekly Citibank account statements from April 1, 1991 to December 1, 1992. Based upon these statements, Cambidex alleges that between the date of the search of the Remendon premises and the date on which the government filed its verified complaint *in rem*, the balance in its Citibank account dropped to as low as approximately twenty-four thousand dollars ($24,000). (Exh. 5, dated May 1, 1991). Cambidex also claims that during the same period of time "over 55 million dollars in totally legitimate funds have passed through the Defendant account." (Cambidex 3(g) Statement at ¶ 3). Cambitur fails to present any similar factual claims.

The government acknowledges that examinations of claimants' accounts reveal that they frequently "zero out," meaning that on day one an account receives a deposit and

---

5. The seizure on the evening of November 12—before this amendment—of a package containing $584,445.41 intended for deposit into Cambitur's American Express account was the subject of a prior Memorandum and Order of this court. Cambidex asserts that it likewise deposited approximately $574,815.79 into its Citibank account after the first warrant was served and before the second was issued (Cambidex Brief at 4); however, evidence submitted by the government indicates that Cambidex relinquished control of its deposits at the Citibank in Cuenca, Ecuador prior to November 12, 1993. (Arrivillaga Decl., dated May 7, 1993, at ¶¶ 26–28 & Exhs. 2–7; Cardenas Affs. ¶ 2). Once an account holder makes a deposit into its bank account, title to the money is transferred to the bank and a creditor-debtor relationship is formed. *See Peoples Westchester Savings Bank v. Federal Deposit Ins. Corp.*, 961 F.2d 327, 330 (2d Cir.1992). Money

becomes the property of a bank upon "deposit"—which is defined as delivery of money into a bank's possession. *See Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 560–61 (2d Cir.1976); *see also United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158 (2d Cir. 1986) (depositor cannot "replevy his money as a specific res" after making deposit). Accordingly, because the funds were surrendered to the relevant bank prior to execution of the warrant and the bank was therefore in control and custody of those funds, Cambidex is not entitled to summary return of the disputed monies. In other words, the factual situation here is different from the factual situation presented in the earlier Cambitur motion where funds were received by American Express after business hours on November 12th. It is also important to note that the funds that were returned to Cambitur remain subject to forfeiture.

then on day two or three that account processes a withdrawal of approximately the same amount. (Arrivillaga Decl., dated May 7, 1993, at ¶ 21; Arrivillaga Decl., dated May 28, 1993, at ¶ 25; Arrivillaga Decl., dated June 17, 1993, at ¶¶ 17, 25–26). However, the government alleges that this "zeroing out" pattern is used to disguise the source and ownership of the funds on deposit. Finally, the government disputes the claimants' representations concerning when and how much legitimate money has passed through these accounts.

## V. *Discovery*

Discovery in this action is still at a preliminary stage. With respect to Cambidex, although no depositions have yet been taken, (AUSA Decl., dated May 7, 1993, at ¶ 10), Cambidex did notice depositions of Special Agent Arrivillaga and approximately twenty Ecuadoran witnesses, including its moving affiants, (AUSA Decl., dated May 7, 1993, at ¶ 5); these depositions were adjourned on consent to allow the government additional time to translate and analyze documents produced by Cambidex. (AUSA Decl., dated May 7, 1993, at ¶ 7). The United States and Cambidex are still trying to work out their disputes over the production of various requested documents.

As of the date of oral argument, Cambitur had failed to answer any of the government's interrogatories or produce any of the documents requested by the United States. (AUSA Decl., dated May 28, 1993, at ¶¶ 8–10). No depositions of Cambitur's representatives had been scheduled or taken. (AUSA Decl., dated May 28, 1993, at ¶ 10). This court consequently ordered Cambitur to comply with discovery requests.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides in relevant part that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has established a clear test for whether an issue

of fact is "genuine" for the purposes of summary judgment. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), the Court stated that a "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Thus, "if the evidence is merely colorable ... or is not significantly probative, ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511.

■ The existence of such a genuine issue of fact does not in itself defeat a motion for summary judgment, however; rather, the issue must be of a material fact. As the Court further stated in *Anderson:* "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. Thus, in order to evaluate the materiality of any disputed facts, this court must examine the substantive law underlying plaintiff's causes of action; it is only with reference to those governing standards that this court may determine whether or not the entry of summary judgment is appropriate.

■ Finally, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. Insofar as granting a motion for summary judgment "deprives a party of its day in court and the right to present its cause to a jury, the district court in examining the record must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir.1989); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986); *Taggart v. Time, Inc.*, 924 F.2d 43, 45–46 (2d Cir.1991). As these rules make clear and contrary to claimants' assertions, they as moving parties bear the burden of proof on this motion. Should it appear from the affidavits of the party opposing the sum-

mary judgment motion—in this case, the government—that it cannot present facts essential to justify such opposition, the court may deny the motion or order a continuance to permit discovery to proceed. Fed. R.Civ.P. 56(f).

As alluded to above, claimants in this case essentially make three arguments in favor of their motion for summary judgment. They first assert that based on the Second Circuit case of *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir.1986), the government lacked probable cause to seize and forfeit the monies on deposit in the subject accounts since any tainted funds (or "traceable proceeds") had entered and left the accounts prior to the government's November 1992 seizure. Second, claimants assert that the statutory "fungible property" exception to this tracing analysis has a one-year limitations period which bars this action, since the defendant funds were seized more than twelve months after the Remendon search. Third, claimants contend that they are "innocent owners" of the funds. This court examines each of these arguments below.

### I. *Banco Cafetero*

■ Probable cause to seize and forfeit an active bank account under civil forfeiture laws requires that the funds in that account be somehow "traceable" to the alleged unlawful activity that gave rise to the forfeiture in the first place. *See* 18 U.S.C. § 981(a)(1)(A); 21 U.S.C. § 881(a)(6). In *Banco Cafetero*, 797 F.2d 1154 (2d Cir.1986), the government sought forfeiture of narcotics proceeds that had been deposited in various bank accounts in which the tainted funds were then commingled with allegedly legitimate money. The statutory basis for forfeiture was a provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 881(a)(6), which provides that the United States may forfeit:

> (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used

> to *facilitate* any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

21 U.S.C. § 881(a)(6) (emphasis added). The claimants in *Banco Cafetero* contended "that the fungibility of money makes it impossible to consider any portion of the depositor's credit balance to be 'traceable proceeds' because the credit balance does not represent just the proceeds of drug sales but is instead the net result of various deposits and withdrawals." *Banco Cafetero*, 797 F.2d at 1159.

In rejecting that contention and holding that the forfeiture statute could reach proceeds "commingled" with other assets, the Second Circuit relied upon the Joint Explanatory Statement of Titles II and III, Psychotropic Substances Act of 1978, Pub.L. No. 95–633, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9518, 9522, which provides as follows:

> [I]f such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed.

*Banco Cafetero*, 797 F.2d at 1159. The question that remained, said the court, was "under what circumstances a 'traceable connection' exists between a drug sale and a credit balance of an active account into which some drug sale proceeds were deposited." *Id.* That question was answered by the application of an accounting technique known as the "lowest intermediate balance" analysis exemplified by this illustration: if $100 from a drug sale is deposited into an active account, the proceeds in the account are "traceable" to the extent of $100 as long as the account balance never falls below that amount; untainted money added to the account after the balance falls below $100 is immune from seizure. The Second Circuit referred to this analysis as the "drugs in—last out" rule. *Id.*

& n. 5; *see also United States v. All Funds on Deposit in Great Eastern Bank Account No. 11008117*, 804 F.Supp. 444, 446 & n. 3 (E.D.N.Y.1992) (Amon, J.) (*"Great Eastern Bank"*). The *Banco Cafetero* court adopted the "lowest intermediate balance" analysis from the law of Trusts where it is used when a trustee mingles personal funds with trust funds, *see* Restatement (Second) of Trusts § 202(1) comment j (1959), and from the law of secured transactions when proceeds of the sale of collateral are traced in commingled funds in the hands of the debtor. *But see United States v. $448,342.85*, 969 F.2d 474, 477 (7th Cir.1992) ("[R]ules designed to adjust accounts between (apparently) honest persons are not suited to frauds in which funds have been shuffled at least in part for the purpose of disguising this source.").

Claimants cite *Banco Cafetero* for the proposition that no probable cause exists in this case with respect to the subject accounts because any and all "tainted" money had already passed through those accounts by November of 1992, the time of seizure. For support, Cambidex points to the fact that between the date that the Remendon money orders were deposited into its account and the date of seizure, the balances in that account had fluctuated to as low as $24,000; as mentioned above, Cambitur makes no similar factual allegation regarding its balance. In response, the government contends that the *Banco Cafetero* tracing analysis applies only to narcotics forfeitures under 21 U.S.C. § 881(a)(6) and not to forfeitures for money

laundering under the subsequently-enacted 18 U.S.C. § 981; the government also asserts that the facts of this case are sufficiently distinguishable from the facts of *Banco Cafetero* to justify this court in rejecting that tracing analysis, namely, a "drugs in—last out" rule. Alternatively, the government argues that the fungible property statute, 18 U.S.C. § 984, which was enacted in October of 1992 to circumvent loopholes created by *Banco Cafetero*, applies to the seized funds and, contrary to claimants' assertions, the one-year statute of limitations in Section 984 does not bar the forfeiture. A discussion of the chronology, language, and legislative history of the relevant statutes and the caselaw interpreting them, other than 21 U.S.C. § 881(a)(6) and *Banco Cafetero*, will point the way to an assessment of the validity of the government's assertions and to a disposition of this motion.

## II. *Section 981*

Congress enacted Section 981(a)(1)(A) of Title 18 of the United States Code in 1986, shortly after *Banco Cafetero* was decided. That statute provides in pertinent part:

(a)(1) [T]he following property is subject to forfeiture to the United States:

(A) Any property, real or personal, *involved in* a transaction or attempted transaction in violation of section 5313(a) or 5324(a) of title 31,[6] or of section 1956 or

---

**6.** 31 U.S.C. § 5313, Reports on Domestic Currency Transactions, provides in pertinent part:
(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States ... currency ... in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.
Under 31 C.F.R. § 103.22 a financial institution must file a CTR for any transaction involving currency of more than $10,000.00.
31 U.S.C. § 5324, entitled Structuring Transactions to Evade Reporting Requirement Prohibited, provides in pertinent part that:
(a) No person shall for the purpose of evading the reporting requirements of section 5313(a) ... with respect to such transaction

(1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);

\* \* \* \* \* \*

(3) structure or assist in structuring or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.
"Structuring, also known as 'smurfing,' involves engaging in a series of cash transactions, each under the reporting ceiling of $10,000.00, at different banks on the same or different days or at the same bank on different days, for the purpose of moving a large aggregate of funds through financial institutions while avoiding the currency reporting requirements." *Great Eastern Bank*, 804 F.Supp. at 445 n. 2.

1957 of this title,[7] or any property *traceable to* such property.

18 U.S.C. § 981(a)(1)(A) (emphasis added). As this language makes clear, Section 981 authorizes civil forfeiture of property "involved in" or "traceable to" money laundering or structuring violations. Unlike 21 U.S.C. § 881(a)(6), however, Section 981 does not expressly include the word "facilitate." Nevertheless, several district courts have upheld expansive seizures of legitimate funds by deeming them to be property used to "facilitate," and therefore property "involved in," a money laundering offense. *See United States v. Certain Accounts, together with all Monies, etc.*, 795 F.Supp. 391, 397 (S.D.Fla. 1992) (*"Certain Accounts in Florida"*); *United States v. Certain Funds on Deposit in Account No. 01-0-71417, Located at Bank of New York, et al.*, 769 F.Supp. 80, 84 (E.D.N.Y.1991) (Spatt, J.) (*"Certain Funds in New York"*); *United States v. All Monies In Account No. 90-3617-3*, 754 F.Supp. 1467, 1472 (D.Haw.1991) (*"All Monies"*). As the government places substantial reliance on this "facilitation" theory under Section 981, this court examines the theory in some depth.

In *All Monies*, 754 F.Supp. at 1467, the first case to apply a facilitation theory to Section 981, the government sought to forfeit funds in a bank account owned by a Peruvian money exchanger by arguing that the funds constituted proceeds traceable to drug trafficking, subject to forfeiture under 21 U.S.C. § 881(a)(6), *and* property involved in money laundering, subject to forfeiture under 18 U.S.C. § 981(a)(1)(A). The buying and selling of United States dollars and Peruvian intis comprised a major part of the account holder's primarily legitimate business. Relying on both of the above-cited statutes, the government asserted that all of the money in the account, including the legitimate money, was subject to forfeiture because it somehow "facilitated" the narcotics and money laundering violations. 754 F.Supp. at 1472.

Observing that Section 981(a) did not contain the word "facilitate," the *All Monies* court nevertheless agreed with the government and found Section 981(a)(1)(A) to apply "to all property that facilitates violations of §§ 1956 and 1957." *Id.* at 1473. In reaching this conclusion, the court placed substantial emphasis on the following excerpt from the legislative history of 18 U.S.C. § 981(a):

> "[T]he term 'property involved' is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense."

*Id.* (*quoting* 134 Cong.Rec. S17365 (daily ed. Nov. 10, 1988)). Finding "no reason to believe the scope of [facilitation] theory [to] be any different under § 981" than it is "in cases involving statutes which expressly use facilitation language," the *All Monies* court concluded that any property which "makes the underlying criminal activity less difficult or 'more or less free from obstruction or hindrance'" is subject to seizure. *Id.* at 1473 (*quoting United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir.1990)). Applying this theory to the facts before it, the *All Monies* court found probable cause to believe that the account in question was "a repository for the drug proceeds in which the legitimate money could provide a 'cover' for those proceeds, thus making it more difficult to trace the proceeds." *Id.* at 1475–76. In addition, the *All Monies* court held that Section 881(a)(6),

---

7. 18 U.S.C. § 1956, Laundering of Monetary Instruments, provides in relevant part that:

   (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

       \*    \*    \*    \*    \*    \*

   (B) knowing the transaction is designed in whole or in part—

     (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

     (ii) to avoid a transaction reporting requirement under State or Federal law,

   shall be [guilty of a crime].

   And 18 U.S.C. § 1957(a), Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, provides that:

   Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000.00 and is derived from specified unlawful activity, shall [be guilty of a crime].

which expressly includes the word "facilitate," provided an alternative basis for the government's seizure of the entire contents of the money exchanger's bank account. 754 F.Supp. at 1473.

In contrast to *All Monies,* subsequent cases discussing facilitation theory did not allege violations of narcotics statutes but rather premised forfeiture solely on 18 U.S.C. § 981(a). For example, in the second case to adopt facilitation theory, *Certain Accounts in Florida,* 795 F.Supp. 391, the government sought to forfeit monies on deposit in 31 bank accounts as property involved in or traceable to money laundering. That action arose out of the arrest of Zappata, a "smurf" who had "attempted to assault" a customs agent with a machine gun and in whose possession the government found receipts for over one million dollars in money orders and various other incriminating papers. *Id.* at 392–93. Zappata's arrest led to seizure of two types of accounts: "direct recipient accounts" into which the Zappata money orders had been deposited; and "indirect recipient accounts" into which checks drawn on the direct accounts were negotiated. *Id.* at 393. In holding that the direct recipient accounts were subject to forfeiture, the *Certain Accounts in Florida* court explained that the determination that all funds in an account must be deemed "involved" in money laundering rests

on a sound understanding of the crime that Congress sought to deter by enacting § 981. "Innocent" funds are typically a prerequisite to the successful completion of money laundering, the essence of which is the purposeful mixture of tainted money with funds otherwise above suspicion. The more innocent the funds appear to be, the more difficult the crime becomes to detect. Therefore, funds are not immune from forfeiture [under § 981] solely because they are derived from legitimate sources; if such funds are used to effectuate money laundering, they are forfeitable under § 981, just as an otherwise legitimate

dwelling would be under § 881 if used for drug related activity.

795 F.Supp. at 397.[8]

With respect to the indirect recipient accounts, however, the *Certain Accounts in Florida* court found the connection to money laundering, as alleged, to be too tenuous:

Under the foregoing construction of § 981, a syllogism can be created that would subject the whole of the indirect accounts to forfeiture. First, as noted above, the entire balance of the direct accounts, is allegedly property "involved in" the crime of money laundering. Second, any check written on the direct accounts is property "traceable to" property "involved in" money laundering. Therefore, the tainted checks from the direct accounts deposited in the Florida indirect accounts would subject the balance of the indirect accounts to forfeiture. The logical import is that no separate showing of "taint" would be required to plead a case against the indirect accounts. *Like a contagious disease, each direct account could contaminate any account that had dealings with it.* The indirect accounts could then conceivably pass on the infection to other accounts, and so forth *ad infinitum.* The outer limits of this theory would be bounded only by Plaintiff's imagination.

*Id.* at 397–98 (emphasis added). The court therefore granted the claimants' motion to dismiss as to the indirect recipient counts but gave the government leave to amend the complaint to allege additional facts against the funds deposited therein to give rise to a reasonable belief that those funds facilitated money laundering. *Id.* at 399.

Three courts in the Second Circuit have discussed facilitation theory under Section 981. First, in *Certain Funds in New York,* 769 F.Supp. at 82, the government commenced a civil forfeiture proceeding pursuant to 18 U.S.C. § 981(a)(1)(A) against all funds on deposit in accounts allegedly used by the perpetrators of a fraud to launder the proceeds of that fraud. *Id.* at 82. Claimants argued that the government was not entitled

8. The court also compared facilitation theory in the narcotics context with facilitation theory in the money laundering context and discussed the complexity of the latter, which often involves money—rather than a home or a business—as the "facilitating" property. *Id.* at 395–96 & n. 9.

to arrest the entire contents of the accounts but rather only the amounts actually traceable to proceeds of the alleged illegal activities. *Id.* at 84. Judge Spatt disagreed, adopting the facilitation theory based on the following rationale:

> Section 981(a)(1)(A) of Title 18 U.S.C. ... has been construed by the district courts as authorizing the forfeiture of an entire bank account or business which was used to "facilitate" the laundering of money in violation of 18 U.S.C. § 1956 (*see, e.g., United States v. All Monies ($477,048.62) in Account No. 90-3617-3,* 754 F.Supp. 1467, 1473 [D.Haw.1991].... Even if a portion of the property sought to be forfeited is used to "facilitate" the alleged offense, then all of the property is forfeitable (*see United States v. Santoro,* 866 F.2d 1538, 1542 [4th Cir.1989)]..... As the government contends, limiting the forfeiture of funds under [the present] circumstances to the proceeds of the initial fraudulent activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme. *It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue.*

*Id.* at 84–85 (emphasis added). Accordingly, the claimants' motion for summary release of the funds was denied.

The two other courts in this circuit to comment on facilitation have done so less directly. In *Great Eastern Bank,* 804 F.Supp. at 447, Judge Amon found the facilitation theory inapplicable to forfeiture actions based *solely* on violations of the currency reporting requirements under 31 U.S.C. §§ 5313 and 5324 without any showing that the offending transactions involved the proceeds of illegal activity; she recognized the logic of applying that theory, however, where the government seeks forfeiture on the basis of money laundering violations under Sections 1956 and 1957. *Id.* at 477. And in *Marine Midland Bank, N.A. v. United States,* 1993 WL 158542, 1993 U.S.Dist. LEXIS 6200 (S.D.N.Y. May 11, 1993), *recon-*

*sideration denied,* 1993 WL 248796, 1993 U.S.Dist. LEXIS 8692 (June 28, 1993), Judge Patterson found the facilitation theory inapplicable to funds in an interbank account that were seized because a substantial majority of the postal money orders negotiated through that account allegedly were structured to avoid reporting requirements and contained symbols used by drug cartels. Finding that the government failed to provide any facts connecting the balance of the account to the illegal activity, Judge Patterson reasoned as follows:

> Unlike the otherwise legitimate funds previously determined by other courts to be subject to forfeiture because they "facilitated" money laundering offenses, the subject property in this action has a merely "incidental or fortuitous" connection to illegal activity.... *In this action, the Government seeks forfeiture of the contents of an interbank account and makes no allegations that such account is controlled, nominally or effectively, by anyone with even a partially illegal purpose.* The government does not dispute that the interbank account provides for administrative processing of financial instruments negotiated between Panama and the United States. *Legitimate funds in the interbank account are commingled with tainted funds merely because they are both passing back into this country from Panama....* [T]he seizure here raises a ... concern that suspect money orders "like a contagious disease" would "contaminate" any account with which they happen to come into contact and thus wreak havoc upon the international banking system.

*Id.* 1993 WL 158542, at *7–8, at *25–26 (*quoting Certain Accounts in Florida,* 795 F.Supp. at 398) (emphasis added).

Based on the above-cited cases, the government argues that in this case the funds in the defendant accounts are subject to forfeiture under Section 981 because they "facilitated" the crime of money laundering and that *Banco Cafetero* has no application to that statute. The validity of this contention is problematical for two reasons. First, although "facilitation" is explicitly aimed at in 21 U.S.C. § 881(a)(6), the statute which was

before the Second Circuit in *Banco Cafetero*, it was neither mentioned nor considered. Second, the above-cited cases do not directly address the applicability of *Banco Cafetero* to the seizure and forfeiture of money laundering proceeds under Section 981.[9] Since the accounts in some of those cases discussed above were as volatile as the accounts at issue here, it might be inferred that in ignoring the *Banco Cafetero* analysis those cases rejected, *sub silentio*, the applicability of that analysis to actions brought under Section 981. That inference might have been plausible were it not for the enactment of 18 U.S.C. § 984, a discussion of which follows.

### III. *Fungible Property Forfeiture and 18 U.S.C. § 984*

#### A. *Fungible Property Generally*

■ Before turning to Section 984, it is important to say a few words about civil forfeiture actions insofar as fungible property is concerned. Ordinarily, these *in rem* actions proceed against *specific* property involved in criminal wrongdoing; because the property itself and not its owner is deemed the "guilty" party,[10] it normally makes no sense to allow a court to order forfeiture of a substitute asset. For example, when a building used to facilitate a narcotics transaction is destroyed prior to seizure, the government may not proceed against a second building *merely* because it is owned or occupied by the same person; ordinarily, only if criminal activity occurred in that second building would it be subject to civil forfeiture. *See* H.R.Rep. No. 102–28, 102d Cong., 1st Sess. at 47 (1991) ("[I]f the theory underlying the forfeiture is that a specific piece of property

is 'guilty' and therefore forfeitable regardless of who its owner may be, it would make no sense for the government to order the forfeiture of another 'innocent' asset when the guilty one is unavailable.") [hereinafter H.R.Rep. 102–28]; *see also Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–88, 94 S.Ct. 2080, 2090–94, 40 L.Ed.2d 452 (1974) (discussing history of and theory behind civil forfeiture actions).

These principles are complicated where fungible property is seized since identifying the particular funds traceable to the criminal violation is nearly impossible. As Congress explained in the legislative report for the Money Laundering Control Act Amendments of 1991, in these particular forfeiture actions the rule that only the "guilty" property is forfeitable no longer makes sense:

> In a case involving a quantity of cash, for example, that had been commingled with other cash, or kept in a place where large quantities of cash were constantly being added and subtracted, the government could no more identify the specific dollar bills subject to forfeiture than it could identify a specific ton of grain in a grain elevator or a specific pile of bricks in a brickyard. In such a case, the government should be able to obtain title through civil forfeiture *to the identical property found in the place where the "guilty" property had been kept.* Section [984] allows for the seizure of cash in this circumstance.

H.R.Rep. 102–28 (emphasis added); *see also* 137 Cong.Rec. S12235–12239 (Aug. 2, 1991).

---

**9.** Judge Amon implies that the analysis is pertinent by observing in a footnote as follows:

> As the magistrate judge noted, under *Banco Cafetero Panama* funds in a tainted account are considered traceable to illegal funds based upon a lowest-intermediate balance rule. Under that theory, funds in a seized account would be considered traceable so long as the account balance never falls below the sum of the tainted monies deposited therein. 797 F.2d at 1159. If this method, originally used to trace the proceeds of illegal drug transactions, was applied in this instance the government would be limited to the seizure of $6,340, the amount on deposit at the time of seizure. The magistrate judge suggested that use of this method is now suspect in light of proposed

amendments to the forfeiture provisions. Despite Congressional criticism, however, no amendments have as of yet been signed into law, and *Banco Cafetero Panama* remains good law in the Second Circuit.

*Great Eastern Bank*, 804 F.Supp. at 446 n. 3.

**10.** *But see Austin v. United States*, —— U.S. ——, ——, 113 S.Ct. 2801, 2808–09, 125 L.Ed.2d 488 (June 28, 1993) ("The fiction 'that the thing is primarily considered the offender,' ... has a venerable history in our case law.... Yet the Court has understood this fiction to rest on the notion that the owner who allows his property to become involved in an offense has been negligent.") (citations omitted).

The two theories detailed in the earlier section of this opinion—*Banco Cafetero* tracing analysis and facilitation theory—appear to have been designed by courts to deal with the problem posed by fungible property; each construct has provided a means by which a court may adjudicate a forfeiture of fungible property consisting of deposits in an account which contains both legitimate funds and direct proceeds of crime. In Section 984, the fungible property statute, Congress designed a new way of contending with that problem.

## B. *Section 984*

■ Section 984 was enacted in October of 1992 and provides in relevant part as follows:

(a) This section shall apply to any action for forfeiture brought by the Government in connection with any offense under section 1956, 1957, or 1960 or section 5322 of title 31, United States Code.[11]

(b)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or other fungible property—

(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(c) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

**11.** With respect to Section 5322, see note 12 and accompanying text *supra*.

**12.** Subchapter II of Chapter 53 of Title 31, entitled Records and Reports on Monetary Instru-

18 U.S.C. § 984. This statute applies to any action brought under Section 981, as the legislative history makes clear:

Section 30 adds a new section 984 to title 18 that is applicable to any civil forfeiture action brought under section 981(a)(1)(A) or any other statute where the offense giving rise to forfeiture is a violation of 18 U.S.C. §§ 1956 or 1957 or 1960 (as enacted by this legislation), or any provision of subchapter II of chapter 53 of title 31 punishable under 31 U.S.C. 5322.[12]

H.R.Rep. 102–28.

■ Subsection (b)(1) of Section 984 addresses the *Banco Cafetero* holding directly: the government need not prove that property subject to forfeiture is the identical property involved in the money laundering violation; and claimants may not use a "zeroing out" argument to immunize the substitute property from seizure. Instead, "any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture," subject only to the one-year limitation period of subsection (c). The clear implication of this statute is that *Banco Cafetero*'s tracing analysis applies to forfeiture actions brought under Section 981; any other reading would render the above provisions superfluous since a provision for substitution would not be necessary if, as the government argues, the accounting techniques put forth in *Banco Cafetero* did not apply to money laundering forfeitures. *See Astoria Federal Savings & Loan Ass'n v. Solimino*, —— U.S. ——, ——, 111 S.Ct. 2166, 2172, 115 L.Ed.2d 96 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.").

The legislative history of Section 984 confirms this interpretation. Acknowledging the inadequacies that resulted from *Banco Cafetero*'s "drugs in—last out" rule, Congress explained the need for a fungible property provision as follows:

ments Transactions, encompasses Sections 5313 and 5324, the two structuring violations cited by the government as a basis for forfeiture in this case.

Consider ... the case of a bank account involved in a money laundering scheme. Under 18 U.S.C. § 981, all property involved in money laundering is forfeitable to the United States. *United States v. All Monies*, [754 F.Supp. 1467], No. 89–00469–ACK, 1991 U.S.Dist. LEXIS 854, 1991 WL 6599 (D.Hawaii Jan. 23, 1991). Thus, if a money laundering offense involving a million dollars occurs on January 1, and the laundered money is deposited into a given account on that date, the government may seize the million dollars from the account as soon as it is deposited. Under *Banco Cafetero*, the government may still seize the million dollars a month later even if it can be shown that during the month of January there were numerous other deposits and withdrawals as long as the balance never fell below one million dollars. This is because the government is entitled to assume that the first deposit—the million dollars in laundered money—remains in the account until the last withdrawal is made.

The clever money launderer ... being aware of the limitations of the accounting theories underlying cases such as *Banco Cafetero*, will choose to place laundered funds in an account where the balance is highly volatile. For example, he may place the laundered funds in an account held by a money exchanger where, because of the nature of the business, the balance may vary from zero to a million dollars several times a week; yet in that case, the launderer may be assured that his money will still be available when he wants it because the balance in the account is sure to rise again to the million dollar level. *Thus, to continue the above example, if a million dollars in laundered drug money is deposited into a volatile bank account on January 1, and the balance in fact dips to zero several times during the month, but returns to one million dollars by the first of February, the million dollars is still available to the criminal money launderer, but is not forfeitable to the government.*

The above scenario illustrates a weakness in the *Banco Cafetero* holding that can easily be exploited by money launderers, drug traffickers, and others whose criminal proceeds are subject to civil forfeiture. There is no reason why fungible property, such as the balance in a bank account, should escape forfeiture simply because the property is capable of being moved in and out of the government's view with great rapidity. If despite the apparent disbursement of the property it remains capable of being replaced or reconstituted in identical form at any time because of its fungible nature, it should remain subject to forfeiture. Any other rule merely rewards those who contrive sophisticated shell games to hide the whereabouts of criminally derived property.

H.R.Rep. No. 102–28 (emphasis added). As this language demonstrates, Congress clearly shared the government's concern that money launderers would capitalize on *Banco Cafetero* by using volatile accounts to launder their illegal funds. (*See* Callery Decl., dated May 7, 1993, at ¶ 8; Arrivillaga Decl., dated May 7, 1993, at ¶ 21). Section 984 was enacted in response.

Examination of the remainder of the statute and its legislative history indicates that although Section 984 authorizes broad "substitute" seizures, it simultaneously tempers the additional power given the government by means of a statute of limitations:

Section 984 provides that in cases involving fungible property, property is subject to forfeiture if it is identical to otherwise forfeitable property, is located or maintained in the same way as the original forfeitable property, and not more than one year has passed between the time the original property subject to forfeiture was so located or maintained and the time the forfeiture action was initiated by seizing the property or filing the complaint, regardless of whether or not the fungible property was continuously present or available between the time it became forfeitable and the time it was seized. (The time limitation is considered necessary to ensure that the property forfeited has a reasonable nexus to the offense giving rise to the original action for forfeiture).

H.R.Rep. No. 102–28. The legislative solution to the problem raised by application of *Banco Cafetero* in the money laundering context could not be clearer: Congress authorized the government to seize and forfeit property irrespective of whether an account zeroed out but imposed a corresponding one-year limitation for such seizures.

### C. Current Status of Forfeiture Laws

Before applying the teachings of the statutes and case law discussed above to the facts implicated by claimants' motion for summary judgment, this court must determine how to reconcile several inconsistencies that arise as a result of the evolving civil forfeiture laws. More specifically, the question presented is what effect Section 984 has on *Banco Cafetero* and on facilitation theory under Section 981.

Curiously, neither the language of Section 984 nor its legislative history explicitly refers to 21 U.S.C. § 881(a)(6), the narcotics forfeiture statute under which *Banco Cafetero* was decided. Therefore, insofar as the government premises its forfeiture of the moneys involved in this action on Section 881(a)(6), tracing analysis appears to retain its vitality. Accordingly, if forfeiture is predicated on funds being "proceeds of" or "traceable to" a narcotics violation under Section 881(a)(6), and if the seized account has "zeroed out" after that violation, the funds are no longer subject to forfeiture.[13]

■ To the extent that the government attempts to forfeit the monies in the Cambitur and Cambidex accounts as traceable to violations of 18 U.S.C. §§ 1956 & 1957 (money laundering) and 31 U.S.C. §§ 5313 and 5324 (structuring and reporting), Section 984 applies *and* explicitly overrules *Banco Cafetero*. Under this statutory basis for forfeiture, this court therefore need not concern

itself with whether the subject accounts "zeroed out." However, according to the language and legislative history of the pertinent statutes *all* forfeitures of fungible property involved in money laundering or structuring violations are subject to a one-year statute of limitations.

The government argues that this reasoning allows the one-year statute of limitations for Section 984 to supersede the five-year statute applicable to forfeiture actions generally, *see* 19 U.S.C. § 1621; 18 U.S.C. § 981(d); 21 U.S.C. § 881(d); *United States v. One 1987 Jeep Wrangler Auto.*, 972 F.2d 472, 477 n. 6 (2d Cir.1992), and that Congress "would have expressly stated such an intention" had it so intended. This argument is not persuasive. First, Congress *did* state expressly that Section 984 applies to "any civil forfeiture action brought under section 981(a)(1)(A)." H.R.Rep. No. 102–28. Second, Section 981 and its five-year limitations period are still available to the government as a means of civil forfeiture where specific, identifiable property is concerned. Only if the action involves *fungible* property is it subject to the one-year limit.

■ Finally, to the extent that the government seeks to forfeit *all* the monies in the subject accounts as monies which "facilitated" the money laundering violations under Section 981, that result is questionable. As an initial matter, in contrast to 18 U.S.C. § 881(a)(6), Section 981 does not contain the word "facilitate." Having enacted Section 981 well after Section 881(a)(6), Congress surely could have included such language had it intended to do so. Instead, Section 981 uses only the words "involved in" and "traceable to." Nevertheless, several sister courts have adopted a facilitation theory under Section 981 based on the following excerpt from the legislative history:

---

**13.** There are many reasons why Congress's failure to make Section 984, the fungible property statute, expressly applicable to Section 881(a)(6) violations is curious. First, if Congress disapproved of the loophole that resulted from *Banco Cafetero*'s holding, it should have included in its remedy the statute expressly considered in that case and directly affected by its holding—881(a)(6). Second, 18 U.S.C. §§ 1956 & 1957, the criminal money laundering statutes expressly

referenced in Sections 981 and 984, require that property involved in a financial transaction represent the proceeds of some "specified unlawful activity." In this case, the only "specified unlawful activity" are narcotics violations. Consequently, there appears to be no meaningful distinction between forfeiting the proceeds of narcotics violations under 881(a)(6) and forfeiting the proceeds of "specified illegal activity."

As used in both [Sections 981 and 982], the term "property involved" is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense.

134 Cong.Rec. S17365.[14] For some inexplicable reason, none of those courts discussed whether and how the lowest intermediate balance analysis of *Banco Cafetero* applied to "facilitating" funds; the question is now academic, however, because this court finds that facilitation theory is incompatible with the fungible property statute for the following reasons.

First, Congress implies that commingling is not a basis for forfeiture in stating as follows in the legislative history of Section 984:

> In a case involving a quantity of cash, for example, that had been commingled with other cash, or kept in a place where large quantities of cash were constantly being added and subtracted, the government could no more identify the specific dollar bills subject to forfeiture than it could identify a specific ton of grain in a grain elevator or a specific pile of bricks in a brickyard. In such a case, the government should be able to obtain title through civil forfeiture to the identical property found in the place where the "guilty" property had been kept. Section [984] allows for the seizure of cash in this circumstance.

In other words, substitution is only permissible for the "guilty" property—the tainted funds. With respect to the untainted property with which the specific dollar bills were commingled—the "facilitating" property—substitution does not apply.

Second, facilitation theory is incompatible with the fungible property statute's attendant limitations period. Section 984(c) provides that "[n]o action ... to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year *from the date of the offense.*" 18 U.S.C. § 984(c) (emphasis added). As this language indicates, a cause of action for forfeiture accrues when the illegal activity occurs. *Cf. United States v. Parcel of Land, Bldgs., Appurtenances & Improv.,* —— U.S. ——, ——, 113 S.Ct. 1126, 1127, 122 L.Ed.2d 469 (1993) (" 'By the settled doctrine of this court, whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, *the forfeiture takes effect immediately upon the commission of the act;* the right to the property then vests in the United States, although their title is not perfected until judicial condemnation; the forfeiture constitutes a statutory transfer of the right to the United States at the time *when the offence is committed;* and the condemnation, when obtained, relates back to that time ...' ") (*quoting United States v. Stowell,* 133 U.S. 1, 16–17, 10 S.Ct. 244, 247, 33 L.Ed. 555 (1890) (emphasis added)). Therefore, a cause of action to forfeit property that was the result of "specified illegal activity" under 18 U.S.C. § 1956 accrues when the proceeds of that violation are deposited into a volatile account,

---

**14.** This comment was made in a portion of the *Congressional Record* which explained and reconciled an inconsistency between the forfeiture provisions for money laundering violations (18 U.S.C. §§ 1956 & 1957) and the forfeiture provisions for structuring violations (31 U.S.C. §§ 5313 & 5324). In context, the quoted excerpt of that *Congressional Record* reads as follows:

> There does not appear to be any reason for treating [Title 18 and Title 31] money laundering differently for forfeiture purposes. It is the intent of Congress that a person who conducts his financial transactions in violation of the anti-money laundering statues forfeits his right to the property involved regardless of which statutory provisions he happens to violate.
> Th[is] amendment would rationalize those conflicting provisions by combining section

981(a)(1)(A) and (C) and making the corpus of the money laundering offense subject to civil forfeiture in cases involving both title 18 and title 31 offenses. It would also add a criminal forfeiture provision for title 31 offenses to section 982(a).

> As used in both statutes, the term "property involved" is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense. Both statutes would preserve the exception, derived from the existing language in section 981(a)(1)(C), for violations of 31 U.S.C. 5313(a) committed by financial institutions.

since the deposits may then be deemed as designed "to conceal or disguise the nature, the location, or the control of the proceeds."

Allowing seizure of all monies in an account merely because one illicit transaction was negotiated through that account would erode this limitations period completely. In this respect, an example is helpful. Assume that on January 1, 1995, $100 in drug money and $500 in legitimate money—money that the government has no basis for alleging as being derived from specified unlawful activity—is deposited into an account. On February 1, 1995, the account balance dips to zero. On March 1, 1995, the account climbs to $1,000; once again, the government has no basis for believing that the most recently deposited funds are the proceeds of some specified unlawful activity. The government seeks to forfeit the account on March 2, 1995. If *Banco Cafetero* were the governing law, none of the money would be subject to forfeiture because the unlawful activity occurred before the account "zeroed out." Under Section 984, which allows the government one year in which to forfeit fungible property, $100 is subject to forfeiture as a substitute for the fungible property that was actually involved in the specified unlawful activity. Facilitation theory would allow seizure of the legitimate funds which were commingled with the tainted funds; although it is not exactly clear whether the amount subject to forfeiture would be $900 (the balance *now* in the account) or $500 (the balance originally deposited in the account), there is a strong argument that if forfeiture is premised on the commingling and hiding of illegitimate funds, the entire balance currently in the account would be forfeit.

Now assume that the government did not seize the account on March 2, 1995 but instead waited until January 2, 1996. Clearly, with respect to the $100 and the $500 deposited into the account on January 1, 1995 the one-year period has expired; however, since $1000 replaced the funds in the account on March 1, 1995, the government is still within the one-year statute of limitations for forfeiture of that "facilitating property." In other words, if this court allows facilitation theory to survive enactment of Section 984, a cause

of action for forfeiture would accrue whenever money was deposited into that account, thereby subjecting to forfeiture the balance of any account into which a tainted deposit once was made. Facilitation theory would thus erode the one-year statute of limitations completely.

██ The rationale set forth by Judge Easterbrook in *United States v. $448,342.85*, 969 F.2d 474 (7th Cir.1992), supports this conclusion. In *$448,342.85*, the government contended that Section 981 authorized seizure and forfeiture of accounts which at some point contained the proceeds of a mail fraud but, according to claimants, did not contain those tainted proceeds at the time of seizure. *Id.* at 476. Judge Easterbrook responded to the government's contention as follows:

Shooting for the moon, the United States insists that it matters not whether the balances in the accounts may be traced to "specified unlawful activity." The accounts were "involved in" the fraud during 1988, and that is that. This approach treats the accounts as the criminals, taking the concept of deodands one step further (an account is not even a tangible object). Bank accounts do not commit crimes; people do. It makes no sense to confiscate whatever balance happens to be in an account bearing a particular number, just because proceeds of crime once passed through that account. Suppose Westmont abandoned the speaker business at the end of 1988, sent the balance to the victims as restitution, and used the same account (replenished from an untainted source) to buy and sell Treasury bills. That the "account" had been "involved" in the fraud would be irrelevant; the government confiscates the *funds* not the account. Recall that § 981 authorizes forfeiture of "[a]ny *property* ... involved in a transaction or attempted transaction in violation of ... section 1956" (emphasis added). An "account" is a name, a routing device like the address of a building; the money is the "property." *Once we distinguish the money from its container, it also follows that the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a*

*drop of ink falling into a glass of water.* To the extent *United States v. Certain Funds on Deposit in Account No. 01-0-71417,* 769 F.Supp. 80, 84–85 (E.D.N.Y. 1991) and *United States v. All Monies (477,048.62) in Account No. 90-3617-3,* 754 F.Supp. 1467, 1472–76 (D.Hawaii 1991), treat the account as the "property" for purposes of § 981, we disapprove their finding.

Only property used in or traceable to the "specified unlawful activity" is forfeit. Money need not be derived from crime to be involved in it; perhaps a particular sum is used as the bankroll facilitating the fraud. That is not the United States' theory here....

*Id.* at 476–77 (emphasis added).[15] The government points out that in this case it did as Judge Easterbrook suggested—namely seized the "funds on deposit" in the subject accounts rather than the "accounts" themselves; this attempt to distinguish the subject forfeiture misreads the thrust of the above-quoted passage. The government still seeks to forfeit legitimate funds not because they are involved in specified illegal activity,

nor because they are substitutes for such involved funds, but rather because they inhabit an account that once held or now holds tainted moneys. The mere presence of funds in an account is an insufficient basis for forfeiture.

To summarize, the government is correct in asserting that *Banco Cafetero* presented only the issue of whether funds in an account seized as narcotics proceeds under Section 881(a)(6) were tainted and therefore forfeitable after the account was "zeroed out." Through the fungible property statute, which applies to all actions seeking forfeiture of funds involved in money laundering and structuring violations, Congress responded to money launderers' attempts to circumvent *Banco Cafetero* but checked the government's forfeiture power through a retroactive statute of limitations. Allowing forfeiture of funds that "facilitate" money laundering violations merely by commingling with and hiding illegitimate funds erodes the statute of limitations. This court therefore rejects facilitation theory as a basis for forfeiture in this case.[16]

---

**15.** This result is consistent with the hoary common law principle of confusion which exists when things of the same kind, belonging to different sources, are so intermingled that they can no longer be identified or distinguished. If the goods that are intermingled are of the same kind, quality and value, the parties are entitled to their proportionate share regardless of whether the confusion was caused innocently or wrongfully. 2 Blackstone, *Commentaries* 405 & n. 24 (Lewis ed. 1897) ("The conclusion to be drawn from modern authorities and decisions seems to be that, in cases of negligent and inadvertent mixtures (perhaps even of wilful mixtures), if the goods can be easily distinguished and separated, then no change of property takes place, and each party may lay claim to his own. If the goods are of the same nature and value, although not capable of an actual separation by identifying each particular; yet, if a division can be made of equal value (as in the case of a mixture of corn or of coffee, or tea, or wine of the same kind and quality), then each may claim his aliquot part.") (citations omitted); *see also The Idaho,* 93 U.S. (3 Otto) 575, 585, 23 L.Ed. 978 (1876) ("But even if [the bales of cotton] were of the same kind and value, the wronged party would have a right to the possession of the entire aggregate, leaving the wrong-doer to reclaim his own, if he can identify it, or to demand his proportional part."); *Brainard v. Cohn,* 8 F.2d 13, 15 (9th Cir.1925) ("Where there is ... an intentional intermixture

of ... goods ... so that separation is practically impossible, all the inconvenience of the confusion is cast upon the one who permitted it, and it is for him to distinguish his own property satisfactorily or lose it for the law will not distinguish it for him."); *Somers v. Kane,* 168 Minn. 420, 421, 210 N.W. 287, 287 (1926) (" 'Even if the commingling were malicious or fraudulent, a rule which would take from the wrongdoer the whole, when to restore the other his proportion would do him full justice, would be a rule wholly out of harmony with the general rules of civil remedy, not only because it would award to one party a redress beyond his loss, but also because it would compel the other party to pay, not damages, but a penalty.' ") (*quoting Cooley on Torts* (3d Ed.) at 68).

**16.** The government also argues that *Banco Cafetero* does not apply in this case because the facts are different from the facts in *Banco Cafetero.* The accounts seized in *Banco Cafetero* were correspondent accounts—accounts maintained at banks in the United States by foreign banks. *Banco Cafetero,* 797 F.2d at 1157. In contrast, the accounts seized here are maintained by private entities "whose overwhelming source of deposits is small, even denominations of money orders purchased in the United States." Based on this difference, the government argues that "the possibility that certain legitimate funds could be inadvertently frozen in the seizure of a

## IV. *Applying the Law*

As mentioned above, to the extent that the government premises its forfeiture upon 21 U.S.C. § 881(a)(6), *Banco Cafetero* is still good law, and this court therefore must apply the lowest intermediate balance test to the subject accounts. For the purposes of this motion, claimants concede that money orders seized in the search of the Remendon premises and connected with illegal behavior were negotiated into the defendant accounts in March of 1991. The government concedes that the balances in the defendant accounts plunged between the date of the Remendon search (March of 1991) and the date of forfeiture (November of 1992). Therefore, of the approximately $1,200,000 in Cambidex funds seized by the government on November 12, 1992 only $24,000.00—the account's lowest intermediate balance—is available for forfeiture as narcotics proceeds under 21 U.S.C. 881(a)(6); since Cambitur failed to include any specific facts in its motion papers, it is not clear at this time what if any portion of the funds in its American Express account similarly remain subject to forfeiture under the narcotics statute.

■■■ With respect to the fungible property statute, the government alleges that money laundering and structuring violations occurred as to each account within the limitations period of Section 984, thereby raising a genuine issue of fact as to whether the seized funds should be forfeited under this statute. Any illegal money laundering or structuring activity alleged to have occurred between November 12, 1991 and November 12, 1992 is a permissible basis for forfeiture under Section 984, even if the government discovered the violations as a result of some earlier, pre-limitations period activity—the March 1991 Remendon search and the June 1991 Gomez arrest. It is worth emphasizing that as to any funds seized in a timely fashion, the government need not establish probable cause for that forfeiture at any time prior to trial. *See Banco Cafetero,* 797 F.2d at 1163;

*United States v. All Funds Presently on Deposit, et al.,* 813 F.Supp. 180, 184 (E.D.N.Y.1993). However, if all of the illegal activity occurred outside the limitations period, granting summary judgment for the claimants is appropriate. *See generally United States v. $116,000 in United States Currency,* 721 F.Supp. 701 (D.N.J.1989) (granting motion for summary judgment on limitations grounds in forfeiture action).

■■■ Applying these rules to the facts of this case, this court finds that Cambitur is not entitled to summary judgment at this juncture. During the period from December 1991 through September 1992—within the one year time frame—the government alleges that approximately $1,900,000 in the form of postal money orders which had been purchased to avoid identification were deposited into Cambitur's American Express accounts. (Callery Decl., dated May 28, 1993, at ¶¶ 13–14). In addition, the government alleges that on occasions between February of 1991 and November of 1992, Cambitur issued money orders to an account that investigation has revealed is involved with narcotics trafficking. (Arrivillaga Decl. dated May 28, 1993, at ¶ 23). Therefore, Cambitur has failed to carry its burden of demonstrating the absence of triable factual issues concerning the funds deposited in or attempted to be deposited in the American Express bank and seized by the government as involved in or traceable to money laundering and structuring violations.

■■■ With respect to Cambidex, however, the government alleges only that "suspicious" deposits—totalling $51,000.00—were made into Cambidex's Citibank account on August 14, August 19, and November 13 of 1992. (Callery Decl., dated May 7, 1993, at ¶¶ 18–20). The remainder of the specific allegations concerning the illegal activity associated with the Cambidex account appears to relate directly to money orders discovered in the Remendon search. (Callery Decl., dated

bank's correspondent bank account, which underlay the Second Circuit's accounting methodology in *Banco Cafetero,* simply is not present here." This argument is unpersuasive for several reasons. First, neither *Banco Cafetero* nor its progeny have limited the case to the facts cited.

Second, precisely the same concern is involved here and in any situation where potentially legitimate funds are commingled with tainted funds: until the date on which an innocent owner defense is put forth successfully, those funds are frozen and therefore inaccessible.

May 7, 1993, at ¶¶ 9–11). Further, when questioned at oral argument, the government offered no post-November 1991 illegal activities which would justify the seizure, although a declaration of Agent Arrivillaga supplies the following general allegations:

> Further corroboration of the information furnished by confidential sources is found in the bank records of the defendant accounts produced by Citibank in New York City to the government. These bank records, including those for the Cambidex account, clearly demonstrate that the bulk of the deposits into the Cambidex Account are in the form of even denominations in the sum of $1,000 or less in United States dollars. These money orders were purchased from banks, postal facilities and other institutions in the New York metropolitan area in a manner to avoid identification and reporting requirements of Title 31, United States Code.

(Arrivillaga Decl., dated May 7, 1993, at ¶ 29). As the nonmoving party, the government is entitled to have all reasonable inferences construed in its favor. However, given Cambidex's role as a money exchange house and the concern, voiced in cases cited above, that a court not allow contamination to spread among the funds "[l]ike a contagious disease," *Certain Accounts in Florida*, 795 F.Supp. at 397–98, this court finds the government's general allegations concerning the Cambidex account alone do not rise above "mere suspicion." *See United States v. All Right, Title & Interest in Real Property, etc.*, 983 F.2d 396, 403 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2349, 124 L.Ed.2d 258 (1993); *Banco Cafetero*, 797 F.2d at 1160. Accordingly, Cambidex's motion for summary judgment as to the funds in its Citibank account—less the $75,000.00 which is still subject to forfeiture—is hereby granted.[17]

### V. Innocent Owner Defense

Claimants allege that they are "innocent owners" of the seized funds and therefore are entitled to summary judgment on this basis as well. Under the innocent owner theory, once the government has established probable cause, the burden shifts to a claimant to demonstrate that it is an innocent owner of the seized property. *See United States v. 228 Acres of Land*, 916 F.2d 808, 814 (2d Cir.1990), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991). A claimant must demonstrate by a preponderance of the evidence that it did not consent or have knowledge of the illegal activities and was not willfully blind to those activities. *United States v. One Parcel of Property*, 985 F.2d 70 (2d Cir.1993). A claimant also must prove that it took all reasonable steps to prevent the alleged illegal activity from occurring. *United States v. 141st Street Corp.*, 911 F.2d 870, 879 (2d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991).[18]

The submissions by Cambidex and Cambitur—affidavits of various shareholders attesting to the corporations' business practices—are insufficient to demonstrate innocent ownership at this stage in the case. The government contends and this court agrees that claimants have not submitted proof—other than vague statements—showing the legitimate sources of these funds. Nor have claimants documented their business practices other than stating that Cedulas are required to exchange money, a fact which is not confirmed by the submissions. In sum, neither Cambidex nor Cambitur has established its innocent owner defense by a preponderance of the evidence.

### CONCLUSION

For the reasons provided above, Cambitur's motion for summary judgment is hereby denied. Cambidex's motion is granted

---

**17.** This number is the sum of $24,000, which never zeroed out, and $51,000, which accounts for specific structuring violations alleged within the limitations period.

**18.** In civil forfeiture cases, hearsay evidence is not admissible to establish a claimant's defense of innocent ownership. *United States v. $2500 in United States Currency*, 689 F.2d 10, 16 (2d Cir. 1982), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984); *All Monies*, 754 F.Supp. at 1471.

insofar as funds in the seized account were connected with illegal activity which occurred outside of the limitations period imposed by 18 U.S.C. § 984(c). Therefore, Cambidex is entitled to return of all seized funds save $75,000 which remains subject to forfeiture.

SO ORDERED.