UNITED STATES of America,
Plaintiff,

v.

**$3,148,884.40 UNITED STATES CURRENCY (SEIZED FROM ACCOUNTS OF BITAL), Defendant.**

**No. CV98–04661 ABC (CWx).**

United States District Court,
C.D. California.

Aug. 9, 1999.

---

**1064**

Gregory Staples, U.S. Attorney's Office, Los Angeles, CA, for plaintiff.

Philip Le B. Douglas, Takemi Ueno, Winthrop, Stimson, Putnam & Roberts, New York City, Stephen Mansfield, Marcos Ramos, Akin, Gump, Strauss, Hauer & Feld, Los Angeles, CA, for defendant.

ORDER RE: Claimant's Motion for Judgment on the Pleadings

COLLINS, District Judge.

Claimant's Motion for Judgment on the Pleadings came on regularly for hearing on August 9, 1999. After reviewing the materials submitted by the parties, the arguments of counsel, and the case file, the

Court hereby DENIES Claimant's motion for judgment, but limits the Government's forfeiture action to the amount of bank commissions and bank charges that were not returned to the Government via the cashier's checks.

**I. Background**

This is an *in rem* action arising out of "Operation Check Mark"—an undercover money-laundering sting aimed at Mexican and South American banks. The Government seeks the forfeiture of approximately $3.1 million seized from accounts of Claimant Banco Internacional, S.A. ("Bital"), a Mexican bank.

The alleged probable cause for the seizures is set forth in the declaration of Gregory Williams, a United States Customs Service Special Agent.[1] Williams alleges that, between May, 1997, and March, 1998, at least one Bital employee engaged in money laundering activities with undercover agents. Pursuant to the money laundering scheme, the Government deposited a total of $3,901,798.96 to Bital's "interbank account" at the Bank of New York, New York City.[2] The $3.9 million consisted of both (1) actual drug proceeds from a related undercover drug trafficking sting operation; and (2) "fake" drug proceeds provided by the Government. Williams Decl. ¶ 11. The Bital employee then transferred the money to straw accounts at local Bital branches in Mexico. *Id.* ¶ 10.

Next, Bital would issue cashier's checks, in United States dollars, made out to whatever fictitious names the undercover agents would specify. *Id.* The cashier's checks were drawn on two of Bital's interbank accounts, one at Union Bank in Los Angeles, and the other at Citibank in Buffalo, New York. The cashier's checks were deposited into the Government's undercover account in the United States (the "Undercover Account"). The "fake" drug

---

1. The declaration is incorporated by reference in the complaint, and Bital does not object to the Government's reliance thereon.

2. An "interbank account" is an account that a foreign bank has at a United States bank. An interbank account belongs to the foreign bank, not to the depositors. *See* Mot. at 3 n. 1; Williams Decl. ¶ 10.

proceeds that had originated with the Government were then returned to the Government, less routine bank commissions and charges. The actual drug proceeds, less commissions and charges, were "sent on from the [U]ndercover [A]ccount to the account or accounts designated by" the drug traffickers involved in the related sting operation. *Id.* ¶ 11. Approximately $3.8 million in cashier's checks (of the original $3.9 million) was deposited in the Undercover Account.

On May 18–20, 1998, the Government executed seizure warrants on all three of the Bital interbank accounts involved, seizing a total of $3,148,884.40 ($1.58 million from Bital's Bank of New York account (New York City), $.60 million from Bital's Union Bank account (Los Angeles), and $.97 million from Bital's Citibank account (Buffalo)). Although neither party has clearly addressed the issue, these numbers presumably represent the sum total available in these accounts at the time of seizure. Notably, by the time of the May 18–20 seizures, all the cashier's checks drawn on the Union Bank and Citibank accounts had been cashed by the undercover Government agents, and deposited into the Undercover Account. *See* Opp. at 3:10–12.[3]

On June 9, 1998, the Government filed the instant *in rem* complaint for civil forfeiture of the $3.1 million. On August 11, 1998, Bital timely filed a claim for return of its funds.

On June 25, 1999, after expiration of a Court-imposed six-month stay, Bital filed the instant motion for judgment on the pleadings, arguing *inter alia*, that the forfeiture statutes do not permit seizure because the Government withdrew all drug proceeds prior to May 18–20, 1998. The Government filed its opposition on July 16, 1999. On August 2, 1999, Bital filed its Reply.

---

**3.** To establish that the last cashier's check was deposited prior to May 18–20, 1998, Bital cites to evidence outside the pleadings. *See* Opp. at 3:10–12 (citing Myrna Blancas Decl. ¶ 5). However, the Government does not appear to dispute this factual issue.

## II. Standard for a Motion for Judgment on the Pleadings

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed.R.Civ.Proc. 12(c). For purposes of such a motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1989) (citing *Doleman v. Meiji Mutual Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir.1984); *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967)). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Id.* (citing *Doleman*, 727 F.2d at 1482). "However, judgment on the pleadings is improper when the district court goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment." *Id.* (citations omitted).

## III. Analysis

### A. The Applicable Forfeiture Laws

The Government seeks forfeiture "pursuant to 18 U.S.C. §§ 981 and 984." Compl. ¶ 1. Enacted in 1986, Section 981 ("Civil forfeiture") provides, in pertinent part, as follows:

(a)(1) [T]he following property is subject to forfeiture to the United States:

(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of ... section 1956 or 1957 of this title [the federal money laundering statutes],[4] or any property traceable to such property.

---

**4.** The Government has filed a separate *in personam* civil action against Bital for violation of 18 U.S.C. § 1956(a)–(b).

Section 984 ("Civil forfeiture of fungible property") was enacted in October of 1992, and provides, in pertinent part, that

(a) This section shall apply to any action for forfeiture brought by the Government in connection with any offense under [18 U.S.C. §§ 1956–57]. . . .

(b)

(1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution . . . or other fungible property—

(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(c) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

(d)

(1) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be taken against funds held by a financial institution in an interbank account, unless the financial institution holding the account knowingly engaged in the offense.

The issue in the instant action is how Sections 981 and 984 apply when illegitimate drug proceeds are commingled with legitimate funds in a single account, rendering direct tracing impossible. To understand these statutes, it is helpful to set forth two theories of forfeiture that courts have applied in the context of commingled funds: (1) the "lowest intermediate balance" rule; and (2) facilitation theory.

### 1. Lowest Intermediate Balance

In *United States v. Banco Cafetero Panama,* 797 F.2d 1154 (2d Cir.1986), the Second Circuit held that illegally obtained funds that were commingled with legitimate funds could still be forfeited "but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed." *Id.* at 1159. To determine if a "traceable connection" existed, the Second Circuit adopted an accounting technique known as the "lowest intermediate balance" rule. Under this rule, forfeiture is proper so long as the total balance in the account never falls below the amount of the sum of the tainted funds deposited into the account.

Although the "lowest intermediate balance" method provided a workable rule of law, it created a loophole enabling money launderers to "zero-out" their accounts by moving funds in and out of an account in order to avoid government seizure. For example, if drug proceeds were deposited into a commingled account on day one, the entire account balance withdrawn on day two, and the entire account balance redeposited on day three, none of the money would be subject to forfeiture because the account had been "zeroed-out."

"It was in an effort to sidestep this 'zeroed out' loophole that Congress enacted section 984." *United States v. Funds Representing Proceeds of Drug Trafficking,* 52 F.Supp.2d 1160 (C.D.Cal.1999) (*"Drug Trafficking"*) (citing *United States v. All Funds Presently on Deposit . . . at American Express Bank,* 832 F.Supp. 542, 557 (E.D.N.Y.1993) (*"All Funds"*)).[5] Pursuant to Section 984(b)(1),

---

**5.** In the legislative history of Section 984, Congress repeatedly referred to the *Banco* *Cafetero* opinion by name. *See* H.R.Rep. No. 102–28, 102d Cong., 1st Sess. (1991).

the government need not prove that property subject to forfeiture is the identical property involved in the money laundering violation; and claimants may not use a 'zeroing out' argument to immunize the substitute property from seizure. Instead, 'any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture,' subject only to the one-year limitation period of subsection (c).

*All Funds* (quoting 18 U.S.C. § 984(b)).

### 2. Facilitation Theory

Although *Banco Cafetero* and Section 984 addressed the problems the government faced in distinguishing between illegitimate proceeds and legitimate proceeds in a commingled account, another forfeiture theory—facilitation theory—virtually eliminates the need to distinguish them at all. Facilitation theory works as follows: Under 18 U.S.C. § 981(a)(1)(A), money "involved in" money laundering transactions is subject to forfeiture. Property that facilitates money laundering is considered to be "involved in" money laundering. Under a broad definition of facilitation, untainted money that mixes with drug proceeds facilitates money laundering by making the drug proceeds look innocent or more difficult to trace. Under this broad theory, a single illegal dollar in an account would permanently taint the entire balance in that account.

The facilitation theory has its origins in cases interpreting 21 U.S.C. § 881(a)(6), the civil forfeiture law applicable to property that is "used, in any manner or part, to commit, or to *facilitate* the commission

of, a violation of [the federal drug laws.]" In contrast to Section 881(a)(6), Section 981(a)(1)(A) does *not* use the word "facilitate." Nevertheless, prior to the enactment of Section 984 in October, 1992, several courts held that

[e]ven though § 981 does not expressly include the words "facilitate" or "facilitating," the statute covers property "involved in" illegal money laundering transactions. *See* 18 U.S.C. § 981(a)(1)(A). The legislative history makes it clear that "property involved in" includes property used to facilitate money laundering offenses.

*United States v. All Monies ($477,048.62) in Account No. 90–3617–3*, 754 F.Supp. 1467, 1473 (D.Hawai'i 1991) ("*All Monies*");[6] *see United States v. Certain Funds on Deposit in Account No. 01–0–71417*, 769 F.Supp. 80, 82–84 (E.D.N.Y. 1991). Other pre–1992 decisions, however, rejected facilitation theory as overly broad. *See United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir.1992) ("the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water.") The Ninth Circuit, however, was silent on this issue.[7]

### 3. Viability of Facilitation Theory After the Passage of Section 984

■ Even assuming, *arguendo*, that facilitation theory was previously the law in the Ninth Circuit, the issue remains whether that theory survived the October, 1992, passage of Section 984. In a thorough and well-reasoned opinion, the Eastern District of New York concluded that "facilitation theory is incompatible" with

---

6. The legislative history of Section 981(a) to which the case refers is a passage from the Congressional Record that states:

[T]he term "property involved" is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense.

*All Monies*, 754 F.Supp. at 1473 (quoting 134 Cong.Rec. S17365 (daily ed.) Nov. 10 1988).

7. As the Eastern District of New York noted in *All Funds*, "[f]or some inexplicable reason, [no prior decisions] discussed whether and how the lowest intermediate balance analysis of *Banco Cafetero* applied to 'facilitating' funds." *All Funds*, 832 F.Supp. at 560. Indeed, the two theories appears to represent polar extremes as to the scope of permissible forfeitures.

that section. *See All Funds*, 832 F.Supp. at 560. This Court agrees.

After first emphasizing that neither Section 981 nor Section 984 includes the word "facilitate," the *All Funds* opinion noted that the legislative history of Section 984 emphasizes the idea of substituting "innocent" property for a *specific and limited quantity* of "guilty" property:

> In a case involving a quantity of cash, for example, that had been commingled with other cash, or kept in a place where large quantities of cash were constantly being added and subtracted, the government could no more identify the specific dollar bills subject to forfeiture than it could identify a specific ton of grain in a grain elevator or a specific pile of bricks in a brickyard. In such a case, the government should be able to obtain title through civil forfeiture to the identical property found in the place where the "guilty" property had been kept. Section [984] allows for the seizure of cash in this circumstance.

*All Funds*, 832 F.Supp. at 560 (citing H.R.Rep. 102–28). In other words, "identical property" is substituted for "guilty property." If facilitation theory were the law, the government's inability to "identify [a] specific dollar," (or "a specific ton of grain in a grain elevator") would have been irrelevant because the entire account (or entire stock of grain) could have been seized. The principle of property "substitution" would become unnecessary and irrelevant.

In addition, *All Funds* noted that allowing the government to seize legitimate "facilitation money," would "completely . . . erode" Section 984's one-year limitation on seizing funds in a commingled account. For example, once drug proceeds were deposited into an account, each subsequent deposit of "legitimate" money would be deemed a deposit of forfeitable "facilitating money"—made to "facilitate" violations of the money laundering laws—thereby re-triggering the statute of limitations with each such deposit. *See All Funds* at 561–62. In light of these considerations, *All*

*Funds* "reject[ed] facilitation as a basis for forfeiture" under Section 984. *Id.* at 562; *see United States v. Goykhman*, 1999 WL 97895, at *3 (S.D.N.Y. Feb.22, 1999) (adopting *All Funds*).

## B. Application to the Instant Action

■ In the instant action, the Government purports *not* to rely on a facilitation theory. Notably, the Government cites with approval both *All Funds* and *Goykhman*, and even distinguishes *Goykhman* as a case in which the government sought to "seize funds it alleged *facilitated* money laundering." *See* Opp. at 9:17–20 (emphasis in original). However, once the Government abandons or declines to rely upon facilitation, the Court is at a loss as to how the Government is entitled to seize the funds at issue. As previously noted, the $3.9 million transmitted *to* Bital—via the Bank of New York interbank account—was almost immediately thereafter received back *from* Bital, less commissions—via checks drawn on Bital's Union Bank and Citibank accounts. Once the money was returned to the Government, the issue of tracing became moot. In other words, although the money was non-identifiable during the period it resided in the various Bital accounts because it was commingled at the time, it again became identifiable once the cashier's checks were issued and deposited into the Undercover Account. Because the money was not only again identifiable, but also returned, the problem which Section 984 was enacted to solve— i.e., the Government's inability "to identify the specific property involved in the offense," *see* 18 U.S.C. § 984(b)(1)(A)—no longer existed.

The Government, however, contends that the "plain language" of Section 984 compels a contrary result. *See* Opp. at 6:6–10. In support of its attempted forfeiture, the Government relies on Section 984(b)(1)(B), which provides that "it shall not be a defense that the property involved in such an offense has been removed and replaced by identical proper-

ty." Accepting the Government's application of Section 984(b)(1)(B) would lead to the following result: assume at the time the Government seized the three interbank accounts on May 18–20, 1998, each account contained in excess of $4 million. Because $3.9 million in drug proceeds was deposited at Bital's Bank of New York account, and was then "removed and replaced by identical [money]," the Government's theory would permit $3.9 million to be seized from that account alone. In addition, the Government could argue that a combined $3.9 million was passed through the Union Bank and Citibank accounts, on its way *back* to the Government's Undercover Account. Under the Government's theory, it could again argue that the drug proceeds in the Union Bank and Citibank accounts were "removed and replaced by identical [money]," thereby justifying *another* $3.9 million seizure from these accounts. In fact, similar arguments could be applied to every Bital account to which the Government could trace the $3.9 million. Accordingly, the Government's theory would allow seizure of at least $7.8 million, if not more. This amount would be over and above the original $3.9 million, which was returned to the Government via the cashier's checks. The Court is not persuaded that Section 984 was intended to create such a counterintuitive result. As previously noted, Section 984 was passed in "an effort to sidestep th[e] 'zeroed out' loophole." *Drug Trafficking*, 52 F.Supp.2d at 1164–65. Nothing in that statute's legislative history suggests that it was intended to permit the type of multiple recoveries that the Government's interpretation would allow.

The one issue of concern to the Court is that of the bank commissions and charges. As previously noted, although $3.9 million was wired into Bital, only $3.8 million was returned to the Government in the form of cashier's checks. Although the parties have not clearly briefed this issue, somewhere in the process approximately $100,000 in bank commissions was presumably paid to Bital, and therefore *not* returned to the Government. As to this amount, the Court believes that the Government has probable cause for the seizure.

## V. Conclusion

For all these reasons, the Court hereby DENIES Claimant's motion for judgment, but limits the Government's forfeiture action to the amount of bank commissions and bank charges that were not returned to the Government via the cashier's checks.

**SO ORDERED.**