**UNITED STATES of America,**

v.

**CONTENTS IN ACCOUNT NO. 059–644190–69, in the name of or for the benefit of Carol Capoccia, LLC, at Prudential Securities;** *et al.*

**No. 1:02–CV–72.**

United States District Court,
D. Vermont.

March 18, 2003.

James J. Gelber, AUSA, Office of the United States Attorney, Burlington, VT, for United States of America.

E. Stewart Jones, Jr., Esq., E. Stewart Jones, PLLC, Troy, NY, William Henry Meub, III, Meub Associates, Inc., Rutland, VT, Steven L. Kessler, Law Offices of Steven L. Kessler, New York City, William James Dreyer, Dreyer, Boyajian & Tuttle, Michael L. Koenig, O'Connell and Aronowitz, Albany, NY, Lisa B. Shelkrot, Langrock, Sperry & Wool, Burlington, VT, Howard M. Sinnott, Bennington, VT, Robert K. Reis, Webber, Reis, Holler & Urso, LLP, Rutland, VT, for claimants.

### RULING ON CLAIMANT CAROL CAPOCCIA'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS
(Paper 63)

MURTHA, District Judge.

In this civil forfeiture action, claimant, Carol Capoccia, has moved for partial judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). She contends that some of the funds seized by the federal government during its investigation of the Law Centers for Consumer Protection ("LCCP") are outside the government's reach on statute of limitations grounds or, in the alternative, because the government is unable to trace the seized funds back to

LCCP. In ruling on Capoccia's motion, the standard is the same as under Fed. R.Civ.P. 12(b)(6): the Court must accept the non-moving party's allegations as true and view the facts in the light most favorable to the non-moving party. *See Richards v. Select Ins. Co., Inc.*, 40 F.Supp.2d 163, 165 (S.D.N.Y.1999). Judgment on the pleadings should be granted only if the moving party "is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir.1995) (per curiam).

## BACKGROUND

This civil forfeiture action arises out of a criminal investigation into the activities of LCCP, an organization ostensibly providing consumer debt reduction services. According to a recently filed indictment, millions of dollars have been wrongfully removed from LCCP's accounts and transferred into the accounts of Andrew Capoccia and his wife, Carol Capoccia. In short, the government contends that a substantial portion of the money collected by LCCP for the purpose of repaying its clients' debts was embezzled by the Capoccias for their personal use, leaving its clients substantially worse off than they would have been had they never retained the services of LCCP. In short, the alleged fraud is wide-ranging and reflects a shocking callousness towards people in vulnerable financial conditions whose interests LCCP was hired to serve. The government claims that when LCCP's money was transferred into the Capoccias' accounts, it was involved in money laundering under 18 U.S.C. §§ 1956 and 1957, making the funds forfeitable pursuant to 18 U.S.C. §§ 981 and 984.

On March 18, 2002, the government commenced the instant action, seeking forfeiture of five security or bank accounts, all in the name of, or under the control of, Carol Capoccia (hereinafter, "Capoccia"). Magistrate Judge Jerome J. Neidermeier found probable cause to believe the assets were forfeitable and issued a warrant authorizing the United States Marshal's Service to seize them. The government alleges that all the funds are properly forfeitable because they contain money wrongfully taken from LCCP. Furthermore, according to the government, the funds are independently forfeitable because their transfer between financial institutions and accounts constitutes money laundering.

The parties have submitted competing charts to the Court tracing funds in Capoccia's accounts back to LCCP.[1] While there is some disagreement among the parties about those transactions, most are uncontested, at least for purposes of this motion. The financial transactions culminating in the seizure of approximately $2,670,000 from Capoccia's five accounts involved dozens of transactions between those, and numerous other accounts, all beginning with 25 wire transfers from LCCP to accounts in Capoccia's control. The first of those transfers occurred on June 23, 2000, and the last on February 6, 2002.

The deceptively straightforward question presented by this motion is whether the statute of limitations governing this forfeiture action is five years, as provided in 18 U.S.C. § 981, or one year, as provided in 18 U.S.C. § 984. If the former, then the government is not precluded from seeking to seize all of the above-listed transfers from LCCP to Capoccia. If the latter, however, then a number of the allegedly wrongful transfers occurred outside of the limitations period and the gov-

---

**1.** Some of the transactions reflected in the government's chart have no obvious basis in their supporting affidavits. The charts, therefore, are purely illustrative and are not themselves considered as supporting the parties' contentions.

ernment may not be entitled to seize those funds.

## DISCUSSION

### 1. *Statute of Limitations*

18 U.S.C. § 981 governs civil forfeiture and provides, in relevant part:

(a)(1) The following property is subject to forfeiture to the United States: (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

When the government seizes property under § 981, it must prove that the property is itself involved in, or is traceable to property involved in, a proscribed transaction. The tracing requirement, however, poses particular problems in the case of money or other fungible property. Once money is deposited into a bank account, the government cannot trace the physical currency. Furthermore, how can the government trace fungible property, like money, back to proscribed conduct once it has been commingled with other fungible property?

In *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir.1986), the Sec-

ond Circuit analyzed precisely this question in the context of the analogous civil forfeiture provisions of 21 U.S.C. § 881. The Second Circuit borrowed the "lowest intermediate balance" rule governing commingling of funds held in trust to establish the so-called "drugs-in, last out" rule under which tainted money is presumed to be the last money withdrawn from the account. *Id.* at 1159. In other words, "if $100 from a drug sale is deposited into an active account, the proceeds in the account are 'traceable' to the extent of $100 as long as the account balance never falls below that amount." *United States v. All Funds Presently on Deposit or Attempted to be Deposited in Any Accounts Maintained at Am. Express Bank*, 832 F.Supp. 542, 551 (E.D.N.Y.1993) (hereinafter, *"All Funds"*).

While the drugs-in, last-out rule permitted the government to seize the defendant assets in *Banco Cafetero*, Congress quickly noticed a potential loophole, "enabling money launderers to 'zero-out' their accounts by moving funds in and out of an account in order to avoid government seizure." *United States v. $3,148,884.40 U.S. Currency*, 76 F.Supp.2d 1063, 1066 (C.D.Cal.1999); *see also All Funds*, 832 F.Supp. at 558 (quoting H.R.Rep. No. 102–28).[2] As Judge Glasser analyzed exhaus-

---

2. "Thus, if a money laundering offense involving a million dollars occurs on January 1, and the laundered money is deposited into a given account on that date, the government may seize the million dollars from the account as soon as it is deposited. Under *Banco Cafetero*, the government may still seize the million dollars a month later even if it can be shown that during the month of January there were numerous other deposits and withdrawals as long as the balance never fell below one million dollars. This is because the government is entitled to assume that the first deposit—the million dollars in laundered money—remains in the account until the last withdrawal is made.

The clever money launderer ... being aware of the limitations of the accounting

theories underlying cases such as *Banco Cafetero*, will choose to place laundered funds in an account where the balance is highly volatile. For example, he may place the laundered funds in an account held by a money exchanger where, because of the nature of the business, the balance may vary from zero to a million dollars several times a week; yet in that case, the launderer may be assured that his money will still be available when he wants it because the balance in the account is sure to rise again to the million dollar level. Thus, to continue the above example, if a million dollars in laundered drug money is deposited into a volatile bank account on January 1, and the balance in fact dips to zero several times during the month, but returns to one million dollars by the first of February, the million dollars is still available to the

tively in *All Funds,* Congress enacted 18 U.S.C. § 984 to deal with the problem of traceability for cash and other fungible property. *Id.* at 557–59; *United States v. Funds Representing Proceeds of Drug Trafficking in the Amount of $75,868.62,* 52 F.Supp.2d 1160, 1164 (C.D.Cal.1999) ("It was in an effort to sidestep this 'zeroed out' loophole that Congress enacted section 984"). Section 984, applying to civil forfeiture of fungible property, provides, in relevant part:

> (a)(1) In any forfeiture action *in rem* in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property. . . .

> (b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

Section 984 gave the government a broad, new power to seize fungible property without regard to its traceability to proscribed conduct, but simultaneously imposed a one-year, instead of five-year limitations period. "The legislative solution to the problem raised by application of *Banco Cafetero* could not be clearer: Congress authorized the government to seize and forfeit property irrespective of whether an account zeroed out but imposed a corresponding one-year limitation for such seizures." *All Funds,* 832 F.Supp. at 559. Moreover, according to Judge Glasser, "*all*

forfeitures of fungible property . . . are subject to a one-year statute of limitations." *Id.* at 559 (emphasis in original).

After the thoroughgoing opinion in *All Funds,* other courts also held that § 984 provides the exclusive avenue for seizing fungible property. According to *All Funds* and the cases following it, the government does not have the option of proceeding under § 981 to seize fungible property, even when it can meet the traceability requirements discussed in *Banco Cafetero;* it must use § 984 *See Marine Midland Bank, N.A. v. United States,* No. 93 Civ. 0307, 1994 WL 381536, at *3 (S.D.N.Y. July 20, 1994) ("[S]ection 984 applies to this action as the government seeks civil forfeiture of fungible property"); *United States v. All Funds Distributed to, or on Behalf of Weiss,* No. 99–CV–1453, 2001 WL 1150217, at *2–*3 (E.D.N.Y. Sept. 21, 2001) (hereinafter "*Weiss*") ("*[A]ll* forfeitures of fungible property . . . are subject to a one-year statute of limitations under § 984 even if the action is brought under § 981(A)(1)(a).") (internal quotation marks omitted). Not all courts agreed, however, and others held the government could seize fungible property under § 981 if it could meet that section's tracing requirements. *See United States v. One Parcel of Real Property with Buildings, Appurtenances and known as 170 Westfield Dr.,* 34 F.Supp.2d 107, 116–18 (D.R.I.1999); *United States v. One 1997 E35 Ford Van,* 50 F.Supp.2d 789, 806–07 (N.D.Ill.1999).

In 2000, Congress amended § 984, adding, *inter alia* a new subsection (d) which provides:

> (d) Nothing in this section may be construed to limit the ability of the Government to forfeit property under any provision of law if the property involved in

criminal money launderer, but is not forfeitable to the government." H.R.Rep. No. 102–

28, quoted in *All Funds,* 832 F.Supp. at 558.

the offense giving rise to the forfeiture or property traceable thereto is available for forfeiture.

According to the government, this new subsection removes all doubt and establishes conclusively that § 984 is not the exclusive basis for forfeiture of fungible property when the property is traceable to proscribed conduct. In other words, the government argues that § 984 was intended to enhance rather than diminish the range of civil forfeiture options available to the government.

Capoccia argues to the contrary. She claims that subsection (d) does not change the plain meaning of § 984, and the reasoning of courts like *All Funds* remains persuasive. In fact, *Weiss*, decided in 2001, followed *All Funds* without even mentioning the newly enacted § 984(d). Under Capoccia's interpretation of the statute, subsection (d) establishes nothing more than the unremarkable proposition that the government is free to pursue non-fungible property under any other available law.[3]

Capoccia's reading of § 984(d) is strained. Its meaning, in the context of the statute as a whole, is plainly to the contrary. By enacting § 984, Congress intended to close the loophole created by *Banco Cafetero*, but did not effect a wholesale replacement of § 981 for fungible property. As subsection (d) now makes clear, § 984 enhances rather than replaces and limits the government's forfeiture powers. Where the government cannot prove the traceability of fungible property, as required by § 981, the government is free to proceed under § 984. But where the government can establish property is traceable to an offense giving rise to forfeiture, it is free to proceed under any other provision of law, whether or not the property is fungible.

## 2. *Traceability of Funds Under § 981*

While the government may proceed under § 981 in this action, thereby taking advantage of that section's five-year statute of limitations, the government must demonstrate the property it has seized is traceable to conduct proscribed by 18 U.S.C. §§ 1956 or 1957. "For the Government to seize any property pursuant to § 981, it must first establish probable cause that the property was involved in an illegal transaction." *United States v. United States Currency Deposited in Account No. 1115000763247*, 176 F.3d 941, 944 (7th Cir.1999) (hereinafter "*U.S. Currency*"). In addition, "the court should look at the totality of the circumstances in making its decision" that probable cause exists. *See id.* The parties disagree about what the government now must show to meet the § 981 traceability requirement.

Under *Banco Cafetero*, the government must establish traceability using the drugs-in, last-out rule. If tainted funds are deposited into an account, those funds are forfeitable so long as the account balance does not drop below the amount of the tainted funds. In the alternative, the government may follow the tainted funds as they are transferred into different accounts, depending on the facts of the particular case. As the Second Circuit explained:

Where the credit in a depositor's account represents the net results of

---

**3.** As Capoccia argued before this Court: "Nothing in this section shall be construed to limit the ability of the government to forfeit property under any other provision of law. That's true. The government can go after other property. They are not limited to this cash in the particular case. However, what the *All Funds* case said, what the *Weiss* case said, and what the ... legislative history said, is when you are dealing with fungible assets [§ 984] applies." (Feb. 6, 2003, Tr. at 55).

transactions that include a deposit of drug money, there is a plausible argument to be made either that the account contains the "traceable proceeds" of the tainted deposit (so long as the balance has not fallen below the amount of the tainted deposit) or that any withdrawal (in excess of the tainted deposit) contains the "traceable proceeds" of such a deposit. Which approach reflects reality in any particular case will depend on the precise circumstances. For example, if a depositor placed a $175 check from his automobile insurer in payment of a damage claim into an account that contained $100 from a drug sale and the next day paid a $175 bill for car repairs, a factfinder would be entitled to conclude that the $175 withdrawal did not contain "traceable proceeds" of the drug transaction but solely the "traceable proceeds" of the insurance payment, with the tainted deposit remaining in the account.

*Banco Cafetero,* 797 F.2d at 1159–60.

*All Funds,* however, found expressly that Congress overruled this aspect of *Banco Cafetero* by enacting § 984. *See All Funds,* 832 F.Supp. at 559 ("To the extent the government attempts to forfeit the monies in [two accounts] as traceable to violations of [relevant law], Section 984 applies *and* explicitly overrules *Banco Cafetero.*") (emphasis in original). All Funds' finding is a natural result of the holding that § 984 must apply to all forfeitures of fungible property, which holding the Court today rejects in light of subsequently-enacted § 984(d). Today's ruling therefore also casts doubt on the finding in *All Funds* that § 984 abrogated *Banco Cafetero.* If, as § 984(d) establishes, the government *may* seize fungible property under § 981 when the property is properly traceable within the meaning of the statute, the

problem of tracing fungible property persists. There is no reason to think that *Banco Cafetero's* drugs-in, last-out rule does not still provide the proper test in this Circuit for traceability when the government seizes fungible property pursuant § 981. Accordingly, despite the finding in *All Funds* to the contrary, *Banco Cafetero* remains good law in precisely the situation presented by the facts of this case. Where the government seizes fungible property pursuant to § 981, the *Banco Cafetero* test for traceability still applies.

1. *Tracing Funds from LCCP to the Capoccia Accounts*

There remains a significant and difficult question whether the government can meet *Banco Cafetero's* tracing requirements in this case. Analyzing this issue requires a detailed examination of the complex web of transactions involving Capoccia's accounts, again viewing the facts in the light most favorable to the government at this stage in the proceeding.

The government has identified 25 separate transfers of funds from LCCP to Capoccia's accounts totaling $1,937,500 within the relevant five-year statute of limitations. Under § 981, however, not all of this money can be traced to the accounts that were ultimately seized. In order to follow the money from LCCP to the Capoccia accounts the government ultimately seized, it is necessary to trace each transfer from LCCP through to its ultimate destination. The following complicated set of transactions were described in the several affidavits of FBI Special Agent Daniel G. Rachek, in particular his affidavit filed on March 18, 2002 (the "Second Rachek Affidavit").

According to Agent Rachek, there is probable cause to believe that LCCP transferred $325,000 to a First Union Account.[4] $303,645 was then transferred from

---

**4.** In the Second Rachek Affidavit, Agent Ra-

chek identified a single transfer of $100,000

that same account into a Republic Security Bank Account No. 11242 (of which, all $303,645 was traceable to LCCP). LCCP added an additional $600,000 to the Republic Security Bank Account No. 11242. Republic Security Bank Account No. 53150 succeeded account No. 11242 when the later account contained $845,994 (of which all $845,994 was directly traceable to LCCP). LCCP transferred $725,000 directly into Republic Security Bank Account No. 53150, for a total of $1,570,994 traceable to LCCP. $300,000 of this money was then transferred to the first of the accounts the government seized: Prudential Account No. 059–644190–69 ("Account No. 1"). $1,000,000 was transferred into the second account the government seized: Prudential Account No. TBJ967131E6 ("Account No. 2"), after passing through Wachovia Account No. RSBCU0469.

LCCP also transferred $512,000[5] into the third account seized by the government: Wachovia Account No. 35–740–093 ("Account No. 3"). $200,000 was transferred from Account No. 3 into a Wachovia Account No. RSBCU0469, which in turn was passed on to Account No. 2. $109,000 was also transferred from Account No. 3 to Key Bank Account No. 325450051868 ("Account No. 4"), the fourth account seized by the government. $69,100 was later transferred from Account No. 4 to Key

Bank Account No. 325490036895, an account held in the name of Capoccia's son, Eugene A. Bizarro.[6] Finally, Account No. 3 was used to pay Capoccia's credit card debts, including to buy $42,000 in jewelry seized by the government, and home improvements valued at approximately $75,000.[7]

The government further alleges that a substantial, additional sum in Account No. 1 is traceable to LCCP. As the Second Rachek Affidavit sets forth:

> Account No. 1 also contains the proceeds of an account at McDonald Investments, held in the name of Carol Capoccia, LLC. That account started as a Key Investment account. In September 1999, Key Investments changed its name to McDonald Investments. The Carol Capoccia, LLC account then became McDonald Account 62254346. That account was succeeded by McDonald Account 62203192. That McDonald account was transferred into the first of a serious of accounts at Prudential, culminating very quickly in the transfer into Account No. 1. That sequence is detailed below. The approximate value of the successor McDonald account at the time of transfer to the Prudential accounts was $212,871.88.

---

from LCCP to the First Union Account. This information was supplemented in an affidavit filed February 24, 2003 (the "Third Rachek Affidavit"), at 4. Agent Rachek's supplementation is properly considered by the Court. *See United States v. $557,933.89, More or Less,* 287 F.3d 66, 89 (2d Cir.2002) ("For purposes of establishing probable cause for forfeiture, the government may rely upon any evidence it has lawfully obtained up to the time of the forfeiture trial.").

5. In the Second Rachek Affidavit, he was only able to trace $325,000 directly back to LCCP. He represented, however, that an additional $277,000 has been received from an account likely belonging to LCCP. There is, therefore,

at least sufficient probable cause at this time to attribute the entire $512,000 to LCCP.

6. Subsequent transfers were made from Account No. 5, but as Capoccia is not a claimant to that account, those transfers need not be discussed further to resolve the present motion.

7. Capoccia's objection to the seizure of her personal and real property is denied. The government has set forth a sufficient basis for a finding of probable cause for its forfeiture to survive the present motion. *See United States v. Bornfield,* 145 F.3d 1123, 1135 (10th Cir. 1998).

The McDonald accounts had been funded with an initial investment on February 23, 1999 of $100,000 by Carol Capoccia. Bank records show that on February 23, 1999, $300,000 was withdrawn from a Carol Capoccia checking account at Key Bank and two bank checks were issued, one for $100,000 and another for $200,000. The $100,000 check was deposited into the Key Investments account which preceded the McDonald accounts. The $200,000 check was also invested in the McDonald account on the same day but that money went into annuity investments .... Between that date and October, 1999, Carol Capoccia made periodic investments of approximately $40,000 each, with the securities account getting half and the other half going into the annuity investments. The last $40,000 investment occurred in October, 1999. Bank records show that all or nearly all of the monies invested in the McDonald account were transferred from Law Centers accounts to Key checking accounts, then to Key money market type funds, then to Key Investments. All the post-Law Centers accounts were controlled by Carol Capoccia.... Significant other monies were added to [the Prudential Securities Account 059–641204–46] and the balance in that account, a total of $739,205.50, was transferred to [Account No. 1]. (Second Rachek Affidavit at 4–5).

This passage from Agent Rachek's affidavit is plainly sufficient for purposes of the present motion to create probable cause that some money in Account No. 1 was traceable to the transactions he details, but it does not establish how much of the money actually came from LCCP. Agent Rachek supplemented his declaration and, in the Third Rackek Affidavit, he declares:

As stated in ¶¶ 4–5 of the Second Rachek Affidavit, very large amounts of money were taken from LCCP and deposited in the McDonalds and Key Bank accounts. Just over $200,000 of those amounts eventually wound up in Account No. 1. Those amounts were withdrawn from LCCP and its predecessors during the period of the fraud .... The rest of the money taken from LCCP during this period of time and put in the McDonald or Key Accounts (about an additional $335,000) eventually was transferred to a Wachovia Account, No. RSBCU0469, winding up in Account No. 2. (Third Rachek Affidavit at 3–4).

■ While Rachek's new affidavit at least quantifies to some extent the amount of money he believes flowed from LCCP into Account No. 1, it fails to provide sufficient detail for the court to evaluate the allegation. A bald assertion that an additional $535,000 in Accounts Nos. 1 & 2 is directly traceable to LCCP, without a more fulsome description of the transactions involved, cannot create probable cause that these funds are, in fact, traceable to LCCP.

To summarize the effect of the transactions listed above, it is possible to trace $300,000 from LCCP to Account No. 1.[8] Account No. 2 had $1,200,000 traceable to LCCP.[9] Account No. 3 had $86,000 traceable to LCCP, after taking into account the tainted funds subsequently transferred out of that account. Account No. 4 had a total of $39,900 traceable to LCCP. Account No. 5 had $14,230 traceable to LCCP. The $75,000 home improvements, as well as the $42,000 in jewelry were also traceable to

---

**8.** This figure would increase to approximately $500,000 if Agent Rachek can support the claims he makes in the Third Rachek Affidavit.

**9.** This figure would increase to approximately $1,550,000 if Agent Rachek can support the claims he makes in the Third Rachek Affidavit.

funds directly from LCCP. The total traceable funds identified by the government equal $1,640,130, plus the real and personal property. At the time of their seizure, however, not all of these accounts contained the full amount of money traceable to LCCP, while other accounts had balances substantially in excess of the funds traceable to LCCP. The government seized all of the funds in each of the five above-listed bank accounts in the following amounts: (1) Account No. 1 had $992,326; (2) Account No. 2 had $1,599,006; (3) Account No. 3 had $75,651; (4) Account No. 4 had $1,617; and (5) Account No. 5 had $2,948.33. In total, the government seized $2,671,549. Capoccia contends the government lacks probable cause to seize money from any account in excess of the tainted funds traceable directly to that account. A table summarizes this comparison.

| Acct. No. | Traceable Funds | Seized Funds | Excess Seized |
|---|---|---|---|
| 1 | $ 300,000 | $ 992,326 | $692,326 |
| 2 | $1,200,000 | $1,599,006 | $399,006 |
| 3 | $ 86,000 | $ 75,651 | 0 |
| 4 | $ 39,900 | $ 1,617 | 0 |
| 5 | $ 14,230 | $ 2,948.33 | 0 |

2. *Seizure of the Innocent, Commingled Funds*

■ If the government were proceeding under § 984, the deficiencies in Account Nos. 3, 4 and 5 could perhaps be used to offset, in part, the excess seizures in Accounts Nos. 1 and 2. Such a set-off would, however, violate the tracing requirements in § 981, the section the government has elected to use. In response to Capoccia's argument, the government claims all of the funds in each of the accounts are seizable because the excess "innocent" funds were commingled with tainted funds and were therefore "involved in" the underlying offense within the meaning of § 981(a)(1)(A). The government is correct insofar as "[t]he key to whether property is forfeitable is whether it is 'involved in' or 'traceable to'

the offense." *United States v. Bornfield,* 145 F.3d 1123, 1135 (10th Cir.1998).

Courts disagree about the ability of the government to seize untainted money commingled with tainted money traceable to underlying, proscribed conduct. Some courts have looked to 21 U.S.C. § 881 for guidance, but that section permits seizure of any property used "to facilitate" an illegal drug sale. "Unlike 21 U.S.C. § 881(a)(6), however, neither [§ 981] nor [§ 984] specifically subjects property used to 'facilitate' an illegal transaction to forfeiture. Thus, there is some disagreement among the courts about whether legitimate money derived from legal sources that is in a bank account used to facilitate a money laundering scheme is subject to forfeiture along with the actual proceeds from the laundering scheme." *U.S. Currency,* 176 F.3d at 946. The validity of the government's "facilitation" theory remains an open question in this Circuit.

A number of courts have held that legitimate funds may be seized under § 984 and § 981 because the act of commingling them with tainted funds is a necessary part of the money laundering scheme. *See, e.g., United States v. Contents of Account Nos. 208–06070 & 208–06068–1–2,* 847 F.Supp. 329, 335 (S.D.N.Y.1994) ("Any legitimate money in the [seized] Accounts would serve to further disguise the source of the illegitimate funds and to make the proceeds of the [criminal] scheme more difficult to trace, and thereby facilitate [claimant's] money laundering scheme."). As one court has explained, " '[i]nnocent' funds are typically a prerequisite to the successful completion of money laundering, the essence of which is the purposeful mixture of tainted money with funds otherwise above suspicion." *United States v. Certain Accounts, Together with all Monies, etc.,* 795 F.Supp. 391, 397 (S.D.Fla. 1992).

Likewise, in *United States v. McGauley*, 279 F.3d 62, 75–77 (1st Cir.2002), the First Circuit upheld a forfeiture verdict encompassing both illegally obtained funds and the legitimate funds with which they were commingled in her bank accounts. That court held the jury was properly instructed that "the commingling of tainted funds ... with legitimate funds is enough to expose the legitimate funds to forfeiture, if the commingling was done for the purpose of concealing the nature or source of the tainted funds (that is, if the commingling was done to facilitate money laundering)". *Id.* at 76.

■ In contrast, other courts have noted the potentially unjustifiable reach of § 981 and § 984 if those sections permit the seizure of commingled, legitimate funds. Returning again to the thoroughgoing opinion in *All Funds,* Judge Glasser examined legislative history and the functioning of § 984 to hold that commingling funds cannot be a basis for forfeiture under § 984. As he reasoned:

> [I]f this court allows facilitation theory to survive enactment of Section 984, a cause of action for forfeiture would accrue whenever money was deposited into that account, thereby subjecting to forfeiture the balance of any account into which a tainted deposit once was made. Facilitation theory would thus erode the one-year statute of limitations completely.

*All Funds,* 832 F.Supp. at 561; *see also* *$3,148,884.40 U.S. Currency,* 76 F.Supp.2d at 1067–68 (following *All Funds*); *United States v. Goykhman,* No. 98 MAG 2691(WK), 1999 WL 97895, at *3 (S.D.N.Y. Feb.22, 1999) (same).[10]

The reasoning in *All Funds* does not apply with equal force in the context of a seizure under § 981 where substitution is unavailable. But an analogous concern is raised in the context of § 981. As Capoccia points out, if the government is able to seize legitimate, commingled funds, it would eviscerate the § 981 tracing requirement. This case in particular demonstrates the nearly limitless contagion the government seeks to release into the banking system. Under *Banco Cafetero* and the government's approach to tracing in this case, tainted funds may be traced *either* to the account into which they are first deposited *or* through subsequent transfers to additional accounts. If those funds are commingled with innocent funds along the way, those innocent funds would become similarly contagious or at least forfeitable under the government's reasoning.

■ There are limits to this principle. Most importantly, courts agree innocent funds are not forfeitable simply because they have been commingled with tainted funds. The innocent funds must have been used in some way to hide the nature of the tainted funds. *See Bornfield,* 145 F.3d at 1135 ("forfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of, his scheme."); *Tencer,* 107 F.3d at 1135 (same). This, however, is a limitation virtually without effect if, as the government has argued here, the commingling of funds is itself evidence that the innocent funds were used to hide the tainted funds. If the tracing requirement in § 981 is to be given any effect— as, indeed, it must—then the government is required to demonstrate something

10. For this reason, the government's alternative theory that the funds are independently forfeitable because their transfer between financial institutions and accounts constitutes money laundering must fail. If the government is correct, both the statute of limitations and the tracing requirements of § 981 would effectively be removed from the statute.

more than the fact of commingling, even across a series of complicated transactions, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds.

▇▇▇ While the LCCP money transferred to Capoccia did travel through a number of accounts, across a series of transactions, there is nothing in the record available to the Court to demonstrate that the commingling of innocent funds in any way contributed to, or facilitated, the underlying money laundering. In fact, this case is indistinguishable from a case in which laundered funds are transferred into an account that, in turn, is used for many different purposes: paying off credit cards, paying taxes, providing start-up funds for a new business venture, giving money to one's children, fixing one's home, and all of the other sundry expenses one may normally incur. While the government was unable to seize the laundered funds until they had been disbursed from the original account or accounts into various other locations, those disbursements or transactions were not, in this case, central to the laundering of LCCP money and did not facilitate the underlying crime.

The alleged money laundering in this case occurred as a result of transferring money from LCCP to Capoccia personally. The fact of the transfer to Capoccia constitutes, in part, both the criminal conduct charged in a separate indictment, as well as the money laundering giving rise to the present forfeiture action. In other words, the money laundering would have been equally as effective if it had not involved any untainted funds but merely the transfer of LCCP funds to accounts in Capoccia's personal control. On the facts of this case, Capoccia's commingling of money amounts to "merely pooling tainted and untainted funds in an account [and] does not, without more, render that account

subject to forfeiture." *United States v. Tencer,* 107 F.3d 1120, 1134 (5th Cir.1997).

A narrower interpretation of this limitation on the seizure of commingled funds would require this Court to reject the "facilitation" theory outright. If "facilitation" means nothing more than the commingling of funds in a complicated series of transactions, the tracing requirement would be a dead letter. Interpreting § 981 to give effect to every word in the statute, *see Allen Oil Co. v. Comm'r of Internal Revenue,* 614 F.2d 336, 339 (2d Cir.1980) ("[A] statute must, if reasonably possible, be construed in a way that will give force and effect to each of its provisions rather than render some of them meaningless"), the Court must either reject the facilitation theory outright, or impose a more stringent limitation than the government endorses. In either case, the government is not entitled to seize the funds from Accounts Nos. 1 and 2 that cannot be traced back to LCCP.

## CONCLUSION

The government has not demonstrated a sufficient basis to establish probable cause to forfeit all of the money seized from Capoccia's five bank accounts, under the standards of Civ. R. Civ. P. 12(c). Agent Rachek, however, has provided a basis to believe the government may be able to trace at least an additional $350,000 back to LCCP under the standards announced in this opinion. Because today's ruling resolves a number of issues that had not previously been ruled upon in this district, the government shall be given 30 days to show cause why money should not be returned to Capoccia consistent with this opinion.

Accordingly, claimant Carol Capoccia is entitled to partial judgment on the pleadings. The amount of any judgment shall be withheld for a period of 30 days pend-

ing further submissions, if any, by the government in support of its claim. If the government elects not to submit additional information, it must return $692,326 from Account No. 1 and $399,006 from Account No. 2 to Capoccia no later than 30 days from the date of this opinion.

SO ORDERED.